1  Patrick D. Webb, SBN 82857
   **WEBB & CAREY**
2  402 West Broadway, Ste 1230
   San Diego CA 92101
3  619-236-1650
   619-236-1283
4
   Attorneys for Plaintiff
5

6

7            **IN THE UNTIED STATES DISTRICT COURT**
             **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
8
   TAREK A. FOUAD, derivatively on behalf of )   CASE NUMBER:
9  nominal defendant DIGITAL SOULA          )
   SYSTEMS,                                  )
10                                           )   **COMPLAINT FOR:**
          Plaintiff,                         )
11                                           )   **(1) BREACH OF CONTRACT**
          vs.                                )   **(2) FRAUD**
12                                           )   **(3) NEGLIGENT MISREPRESENTATION**
   THE STATE OF QATAR, by and through its   )   **(4) UNJUST ENRICHMENT**
13 MINISTRY OF DEFENSE, QATAR               )   **(5) UNFAIR COMPETITION**
   ARMED FORCES, MINISTRY OF                )   **(6) INTERFERENCE WITH PROSEPCTIVE**
14 ECONOMY AND COMMERCE, and               )   **ECONOMIC ADVANTAGE; and**
   DOES 1-30,                               )   **(7) DECLARATORY RELIEF**
15                                           )
          Defendants.                        )
16                                           )
   -and-                                     )
17                                           )
   DIGITAL SOULA SYSTEMS,                    )
18                                           )
          Nominal Defendant, Real           )
19        Party in Interest.                 )
                                             )
20 _____

21        Plaintiff, TAREK A. FOUAD, derivatively on behalf of DIGITAL SOULA SYSTEMS

22 ("DSS"), brings this action as follows:

23                              **PARTIES**

24        1.      Plaintiff, TAREK A. FOUAD, is a United States citizen, resident of California, a

25 British citizen, and founding 20% shareholder of DSS, a Qatar based defense and security consultancy

26 and limited liability company, pursuant to the provisions of Qatar's commercial companies law No. (11)

27 of 2015, which did business in Fullerton, California.  DSS is registered with the Registration and

28 Commercial Licences Department of the Ministry of Economy and Commerce of Qatar, which

                                                                                              1

1

2   registration and the Establishment ID issued by the Ministry of the Interior, show that, as of June 25,

3   2018, and at all relevant times herein, Tarek Fouad was "the manager in charge" "with full and

4   unrestricted authority" and "had signing authority on behalf of DSS, pursuant to Article 7 of the

5   company's Articles of Association Limited Liability. Article 8 provides that "the Company manager

6   shall have the full authority to manage the Company. The acts of the manager shall be binding upon the

7   Company provided that they are endorsed by the capacity under which he has acted," and "shall

8   represent the Company before the judiciary and third parties." This action is filed on behalf of DSS.

9       2.      Nominal Defendant, DIGITAL SOULA SYSTEMS ("DSS"), is a limited liability

10  Qatar company with a corporate headquarters in Doha, Qatar, but did a substantial amount of business

11  in California. DSS has three shareholders, Al Sedriah Holding Company, represented by Lt. Col.

12  Mohamed Al-Mannai, with 60% of the shares, Salam International Investment Ltd., represented by

13  Mr. AbdulSalam Abu-Issa, with 20% of the shares, and Tarek Fouad, with 20% of the shares. Al

14  Sedriah Holding is beneficially owned as to 83% by a member of the Royal Family, and as to 17% by

15  Lt. Col. Al-Mannai. Al Sedriah Holding is also a majority shareholder in Soula Systems and Avyara

16  Information Systems.  Lt. Col. Al-Mannai is also executive chairman of Al Sedriah Holding, Soula

17  Systems and Avyara Information Systems.

18      3.      The relationship between the three DSS shareholders is governed by a

19  Shareholders Agreement, pursuant to which it was agreed that, so long as a shareholder retained an

20  ultimate shareholding of not less than 10%, that shareholder was entitled to representation on the board

21  of directors.  Pursuant to this agreement, Lt. Col. Al-Mannai, AbdulSalam Abu-Issa, and Tarek

22  Fouad, constitute the DSS Board of Directors.

23      4.      DSS is named in this Complaint as a nominal defendant in its derivative capacity,

24  and this shareholder's derivative action is brought on its behalf.

25      5.      Defendant, the STATE OF QATAR, is a foreign state, as defined by the Foreign

26  Sovereign Immunity Act ("FSIA"), 28 U.S.C. 1603.  The head of state and head of government of

27  Qatar is the current Emir of Qatar, Sheikh Tamim bin Hamad Al Thani.  For FSIA purposes, no

28  distinction is drawn between the "state" and its "government." David Stewart, *The Foreign Sovereign*

*Immunities Act: A Guide for Judges*, p. 6 (Federal Judicial Center International Litigation Guide 2013). The State of Qatar maintains a Consulate in the Central District of California.

6.     Defendants,  MINISTRY OF DEFENSE ("MOD") and QATAR ARMED FORCES ("QAF"), and MINISTRY OF ECONOMY AND COMMERCE ("MOEC") (collectively, with the State of Qatar, the Qatar Defendants) are agents and instrumentalities of the government of the State of Qatar. They are the departments responsible for defense procurement in Qatar, and registration of corporations to do business in Qatar. 28 U.S.C. §1603 provides: "(a) a 'foreign state' includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in (b). (b) an 'agency or instrumentality of a foreign state' means any entity– (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." The current Minister of Defense is Dr. Khalid bin Mohammad Al Attiyah, General Headquarters (GHQ), Qatar Armed Forces, P.O. Box. 37, Doha, Qatar. The QAF and MOD also do business in Fullerton, California.

7.     Defendant DOES 1 through 20, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiffs at this time.  When the true names and capacities of said defendants are ascertained, Plaintiffs will seek leave to amend this complaint to insert their true names and capacities.  Each fictitiously named DOE is responsible as a partner, co-conspirator, director, officer, employee, agent, fiduciary, insurer or reinsurer of Defendants, or were involved in the business of Plaintiff and consequently are responsible for the occurrences and claims alleged.  Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named defendants is responsible in some measure for the actions, events and damages herein alleged.

8.     Plaintiff is informed and believes, and based thereon alleges, that at all times herein mentioned, defendants were and are the agents, servants, employees, joint venturers, co-conspirators, and/or partners, each of the others, and all times herein mentioned were acting within the course and scope of said relationships; furthermore, that at all times herein mentioned, defendants and real parties in interest while acting as principals, expressly directed, consented to, approved, affirmed and ratified each and every action taken by the other herein alleged. Each reference to one defendant is

also a reference to each and every other defendant.

9.     Each of the Defendants was engaged and doing business in California at all times relevant to this action.

## SUBJECT MATTER JURISDICTION

10.     The federal question jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1330, 28 U.S.C. 1331, the Federal Arbitration Act ("FAA"), 9 U.S.C. 203, and the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. §1602 et seq.  The pendent and supplemental jurisdiction of this Court over the Plaintiff's state law claims, including, but not limited to, Cal. Corp. Code §800(b), is invoked pursuant to 28 U.S.C. 1367.  Additionally, this Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332, because Plaintiff is a citizen of the state of California and none of the Defendants is a citizen of the State of California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     An action against a foreign sovereign arises under federal law for purposes of Article III jurisdiction. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480 (1983). Here, jurisdiction and procedure are governed by the FSIA. David Stewart, *The Foreign Sovereign Immunities Act: A Guide for Judges*, p. 18 (Federal Judicial Center International Litigation Guide 2013).  However, for most purposes, the statute itself does not provide the substantive law, but provides that where no immunity exists, foreign states "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. §1606. Thus, state substantive law is controlling on most issues of liability in FSIA cases. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 620, 622, n.11 (1983).

12.     This dispute arises from the QAF's breach of a commercial Consultancy Services Agreement (Tender No. TAC/PD/DC/S/88/2013-2014)("the Agreement") with DSS, part of which was performed in Fullerton, California, and which performance elsewhere in Qatar had a direct effect and foreseeable financial consequences in this District. *Seetransport Wiking Trader v. Navimpex Centrala*, 989 F.2d 572, 580 (2d Cir. 1993), finding subject matter and personal jurisdiction under FSIA, even where contract was never performed.

13.     The FSIA, 28 U.S.C. 1605 et seq., is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Repulblic v. Amerada Hess Shipping Corpo*, 488 U.S. 428, 434 (1989).

14.     "Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." 28 U.S.C. 1602.  A foreign state, or its agency or instrumentality, is immune from the District Court's subject matter jurisdiction, if the particular lawsuit does not come within an exception set forth in 28 U.S.C. §§1605-1607. 28 U.S.C. §1604; *Republic of Argentina v. Weltover, Inc.*(*Weltover*) 504 U.S. 607, 610-11 (1992).

15.     This Court has subject matter jurisdiction over the government of THE STATE OF QATAR,, and its MOD, QAF, and MOEC, because they are not immune from the jurisdiction of the courts of the United States under the FSIA, since they **waived** their immunity explicitly or by implication, pursuant to 28 U.S.C. §1605(a)(1).

16.     The Qatar Defendants are within the **implied waiver exception** to sovereign immunity under 28 U.S.C. §1605(a)(1). "[T]he courts have found [implicit] waivers in cases where a foreign state has agreed to arbitration in another country." H.R. Rep. No. 94-1487, at 48 (1976), repreinted in 1976 U.S.C.C.A.N. 6605, 6617;  *Seetransport Wiking Trader v. Navimpex Centrala*, 989 F.2d 572, 578-79 (2d Cir. 1993); *Stati v. Republic of Kazakhstan* 199 F. Supp. 3d 179, 187-88 (D.D.C. 2016) finding Kazakhstan's agreement to arbitrate in Sweden operates as an implied waiver of immunity to suit in the United States; *M.B.L. Int'l contractors v. Republic of Trinidad Tobago*, 725 F.Supp. 52, 54-55 (D.D.C. 1989); *Ipitrade Int'l S.A. v. Federal Republic of Nigeria*, 465 F.Supp.824, 826 (D. D.C. 1978).

17.     This Court also has subject matter jurisdiction over the government of THE STATE OF QATAR,, and its MOD, QAF, and MOEC, because they are not immune from the jurisdiction of the courts of the United States under the FSIA, since this action is based upon a **commercial activity** carried on by the State of Qatar and its MOD, QAF and MOEC, in the United States, and is based upon an act performed in the United States in connection with a **commercial**

**activity** of the State of Qatar and its MOD, QAF and MOEC, elsewhere, and upon an act outside the territory of the United States in connection with a **commercial activity** of the State of Qatar and its MOD, QAF and MOEC, elsewhere and that act causes a **direct effect** in the United States, pursuant to §1605(a)(2). *S. Davis Int'l v. Repub. of Yemen*, 218 F.3d 1292, 1302 (11th Cir. 2000).

18.     The subject matter of the Consultancy Services Agreement is commercial, as defined in the FSIA. 28 U.S.C. 1603(d):  "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." "The term 'commercial' as used in the New York Convention, though it does not have a specific statutory definition, refers to 'matters or relationships, whether contractual or not, that arise out of or in connection with commerce.'" *Belize Social Dev. Ltd. V. Gov't of Belize*, 794 F.3d 99, 103-04 (D.C.Cir. 2015), citing Restatement (Third) of U.S. Law of Int'l Commercial Arb. §1-1 (2012); Restatement (Third) of Foreign Relations Law §487 cmt. F (1987), explaining that "the fact that an agreement to arbitrate is in the contract between a government and a private person may confirm its commercial character;" and *Island Territory of Curacao v. Soliltran Devices, Inc.* 356 F.Supp. 1, 13 (S.D.N.Y. 1973), and further finding "the dispute in this case, which arises out of a service contract between a company and a government to provide biometric and electronic passports...clearly 'arise[s] out of or in connection with commerce.'" See also, *Stati v. Republic of Kazakhstan*, 199 F.Supp.3d 179, 187 (D.D.C. 2016), citing *Diag- Human, S.E. v. Czech Republic-Ministry of Health*, 824 F.3d 131, 135-36 (D.C. Cir. 2016); *S. Davis Int'l v. Repub. of Yemen*, 218 F.3d 1292, 1302-3 (11th Cir. 2000), finding "just a contract" was within the "commercial activity exception," and stating "'import-export transaction involving sales to, or purchases from, concerns in the United States' are included within the conduct of the first clause of §1605(a)(2) and defining commercial activity under §1603(d) to include 'a single contract, if of the same character as a contract which might be made by a private person;" and *Harris Corp. v. National Iranian Radio Television*, 691 F.2d 1344, 1351 (11th Cir. 1982), finding "a letter of credit arrangement [had] a sufficiently direct effect in the United States, and thus ha[d] significant foreseeable financial consequences here," as to fall within the commercial activity exception. "[A]n effect is 'direct' if it

follows as an immediate consequence of the defendant's activity. *Weltover* at 618, (quoting *Weltover, Inc. V. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir. 1991)." *Miel v. Republic of Iraq*, 573 F.Supp.2d 781, 794 (S.D.N.Y. 2008).

19.     A contract between a foreign state and a private party for the purchase and sale of goods and services is presumptively commercial. *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1549 (D.C. Cir. 1987); *Hilaturas Miel, S.L. v. Republic of Iraq*, 573 F. Supp. 2d 781 (S.D.N.Y. 2008) (government agreement to purchase yarn). Even "a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." *Weltover*, 504 U.S. at 614-15; see for e.g.,  *Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 385 F.3d 1206 (9th Cir. 2004) (sale and servicing of Air Combat Maneuvering Range); *Joseph v. Office of the Consulate Gen. Of Nigeria* 830 F.2d 1018, 1023 (9th Cir. 1987)("a contract to purchase military supplies, although clearly undertaken for public use, is commercial in nature...);" *Park v. Shin*, 313 F.2d 1138, 1145 (9th Cir. 2002)(quoting *Joseph*); *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210 (5th Cir. 2009), *cert. denied*, 559 U.S. 971 (2010) (repair services for F-5 aircraft parts and components); *Virtual Def. Dev. lnt'l Inc. v. Republic of Moldova*, 133 F.Supp. 2d 1 (D.D.C. 1999) (contract for sale of MIG-29 aircraft). A motor vehicle lease is a "commercial" activity, even where usage is limited to official business of a foreign government mission to the United Nations.  *Ford Motor Co. v. Russian Fed'n*, No. 09 Civ. 1646 (JGK), 2010 WL 2010867, at *4 (S.D.N.Y. May 10, 2010). Contracts for legal services have also been held to fall within this exception. *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136, 140-41 (D.D.C. 2012).

20.     Where, as here,  the foreign state and its agencies and instrumentalities, unfairly, unlawfully and fraudulently lock out a U.S. minority shareholder's interest in, and management of, a foreign company, thereby denying the minority shareholder's share of the company's earnings and dividends, causing a foreseeable interruption of the contractual flow of capital, management personnel, engineering data, machinery, equipment, materials, and packaging between the foreign state and the United States, that foreseeable interruption substantially and directly affects the United States and is sufficient to satisfy the commercial activities exception. David Stewart, *The Foreign Sovereign*

*Immunities Act: A Guide for Judges*, p. 54 (Federal Judicial Center International Litigation Guide 2013), citing *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990).

21.    Moreover, criminal acts in the course of business or trade, such as bribery, forgery, or fraud, can constitute commercial activity where they are conduct in which private parties can engage. See for e.g., *Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 816 (6th Cir. 2002).

22.    The State of Qatar has also entered into numerous commercial contracts with persons to provide consulting, public relations, offensive cyber and other lawful and unlawful commercial services in order to further the State of Qatar's public relations efforts and economic and commercial interests.

23.    This Court also has subject matter jurisdiction over the government of THE STATE OF QATAR,, and its MOD, QAF, and MOEC, because they are not immune from the jurisdiction of the courts of the United States under the FSIA, since the action seeks to enforce an agreement made by the State of Qatar and its MOD, QAF, and MOEC, with or for the benefit of DSS to submit to **arbitration** all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, concerning a subject matter capable of settlement by arbitration under the laws of the United States, including the Federal Arbitration Act, 9 U.S.C. 201 et seq., and FSIA, 28 U.S.C. 1605 et seq., where the agreement is subject to the New York Convention, which is a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, and since the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under 28 U.S.C. §1605 or §1607, pursuant to §1605(a)(6).

24.    The State of Qatar and its MOD and QAF have agreed in writing to arbitrate this commercial dispute before the International Chamber of Commerce, International Court of Arbitration in London, England, pursuant to Article 56.1 of the Consultancy Services Agreement, and subject to the New York Convention, pursuant to the FAA, 9 U.S.C. §201. The Qatar Defendants are therefore within the arbitration exception to sovereign immunity under 28 U.S.C. §1605(a)(6). *Creighton Ltd. v. Government of the State of Qatar*, 184 F.3d 118, 123-24 (D.C. Cir. 1999)(decided before Qatar became a signatory to the New York Convention in 2002), "Indeed, it has been said with authority that

the New York Convention 'is exactly the sort of treaty Congress intended to include in the arbitration exception...Accordingly we hold that the district court has subject matter jurisdiction over this case pursuant to the arbitration exception in §1605(a)(6);" *S. Davis Int'l v. Repub. of Yemen*, 218 F.3d 1292, 1302 (11ᵗʰ Cir. 2000), "we find that the district court has subject matter jurisdiction pursuant to the arbitration exception under §1605(a)(6)(B)...;" *Africard Co. Ltd. V. Republic of Niger*, 210 F.Supp.3d 119, 124-5 (D.D.C. 2016), "It is well settled that the New York Convention gives rise to jurisdiction under the treaty exception," quoting *Cargill Int'l S.A. v. M'T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993); *Stati v. Republic of Kazakhstan*, 199 F.Supp.3d 179, 189 (D.D.C. 2016), "when a foreign state agrees to arbitrate in a country that has signed the New York Convention, it waives its sovereign immunity in all of the signatory countries..."

25.     The United States, Qatar and the United Kingdom are now signatories to the New York Convention, and the subject matter of the dispute is not entirely domestic in scope, because it involves a dispute arising in both California and Qatar, among non-citizens of the United States. *Africard Co. Ltd. V. Republic of Niger*, 210 F.Supp.3d 119, 123 (D.D.C. 2016).

26.     The Federal Arbitration Act codifies the U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 [known as the New York Convention], into U.S. law. 9 U.S.C. §201-207 (2010). Section 202 of the FAA specifies that: "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial ...falls under the [New York] Convention." "An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States ... shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." 9 U.S.C. §203; *Africard Co. Ltd. V. Republic of Niger*, 210 F.Supp.3d 119, 123 (D.D.C. 2016); *Stati v. Republic of Kazakhstan*, 199 F.Supp.3d 179, 190 (D.D.C. 2016), finding all that is required for jurisdiction under the FSIA is a 'non-frivolous' argument that the controversy is covered by the [New York] Convention," citing *Chevron Corp. V. Ecuador,* 795 F.3d 200, 204 (D.C. Cir. 2015), and *Agadas Chasidei Chabad of U.S. v. Russsian Fed'n*, 528 F.3d 934, 941 (D.C. Cir. 2008).

27.     Therefore, this Court has subject matter jurisdiction under the FAA because: "(1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope." *U.S. Titan, Inc. V. Guangzhou Zhen Hua Shipping Co.* 241 F.3d 135, 146 (2d Cir. 2001); *Stati v. Republic of Kazakhstan*, 199 F.Supp.3d 179, 193 (D.D.C. 2016).

28.     That the New York Convention applies to the arbitration of the Consultancy Services Agreement is undisputed. See, Restatement (Third) of Foreign Relations Law §487 comment b (1987), "the critical element is the place of the award: if that place is in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration." Here, the place of the award was to be, London, England, which is in the territory of the United Kingdom, a signatory to the New York Convention.

## PERSONAL JURISDICTION

29.     "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." 28 U.S.C. §1330(b); *S. Davis Int'l v. Repub. of Yemen*, 218 F.3d 1292, 1303 (11th Cir. 2000); *Foremost-McKesson Inc. V. Islamic Republic of* Iran, 905 F2d 438 (D.C. Cir. 1990)("[p]ersonal jurisdiction under FSIA exists so long as subject matter jurisdiction exists and service has been properly made pursuant to 28 U.S.C. §1608. See, 28 U.S.C. 1330(b)); *Africard Co. Ltd. v. Republic of Niger*, 210 F.Supp.3d 119, 126 (D.D.C. 2016). "[I]n the context of a suit like this against a foreign sovereign, subject matter jurisdiction plus service of process equals personal jurisdiction," as held in *Practical Concepts, Inc. v. Repub. of Bolivia* 811 F.2d 1543, 1548, n. 11 (D.C. Cir. 1987), and *Price v. Socialist People's Libyan Arab Jamahiriya* ("*Price*") 294 F.3d 82, 99 (D.C. Cir. 2002). "Because the Court has concluded that it has subject matter jurisdiction to enforce the arbitral agreement and that service was proper, it finds that it has personal jurisdiction over Niger as well."

30.     There is therefore no requirement for the Qatar Defendants to have minimum contacts in this District for the Court to exercise personal jurisdiction over them. *Price*, at 95-96,

"foreign states are not 'persons' protected by the Fifth Amendment;" *Africard,* at126; "[F]oreign sovereigns and their extensively controlled instrumentalities are not 'persons' under the Fifth Amendment's Due Process Clause– and thus have no right to assert a personal jurisdiction defense." *GSS Grp. Ltd. V. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C.Cir. 2012). "Instead, the provisions of the FSIA determine whether a court can exercise personal jurisdiction over a foreign sovereign." *Africard* at 126; see also, *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009).

31.    Similarly, since the MOD, QAF and MOEC, are agents of the government of the State of Qatar they are not "persons" for purposes of the due process clause and cannot invoke the minimum contacts test to avoid the personal jurisdiction of the district court. *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301-02 (D.C. Cir. 2005).

32.    Qatar's courts have no jurisdiction over this derivative action. This is not a matter which can properly be determined by Qatar's courts. Moreover, such courts cannot guarantee a secure and fair hearing, nor provide a safe environment for all relevant parties to travel to and from the country and attend the hearing. In fact, The Plaintiff has been advised by the U.S. Federal Bureau of Investigation not to return to Qatar, because of threats to Plaintiff's personal safety and because the government of Qatar cannot guarantee a secure and fair hearing, nor provide a safe environment for all relevant parties to travel to and from the country and attend the hearing. Qatar law prevents a civil litigant from leaving the country throughout the pendency of any civil action through appeal and final judgment.  DSS and its managers and officers are unable to seek a fair hearing in Qatar, given the fact that the beneficial shareholder in Al-Sedriah is a member of the Royal Family, and since the government of the State of Qatar and its departments are the Defendants. No law firm in Qatar will prosecute any such action, which involves the actions of a member of the Royal Family, as this case does.

## VENUE

33.    Venue is proper in the District Court for the Central District of California under 28 U.S.C. §1391, because a substantial portion of the events giving rise to the Plaintiff's claims occurred in this District, and because the Defendants are subject to the Court's subject matter and

personal jurisdiction with respect to acts of the Government of Qatar and its MOD, QAF and MOEC, in this District, pursuant to the FAA and the FSIA. Alternatively, venue is proper in this judicial district under 28 U.S.C. §1391J(b)(3) because there is no judicial district in a State in which all non-foreign defendants are resident, and at least one Defendant is subject to personal jurisdiction in California.

## GENERAL ALLEGATIONS

34.     This dispute arises from the QAF's breach of the commercial Consultancy Services Agreement (Tender No. TAC/PD/DC/S/88/2013-2014)("the Agreement") with DSS in relation to the acquisition of a C4I system (command, control, communications, computers and intelligence system) for Joint Operations Command, which was referred to by the parties as the Falcon Project ("the Project"). This dispute concerns the Defendant QAF's failure to pay sums due and outstanding to the Plaintiff pursuant to a contract for the provision of consultancy services, together with the consequential damages suffered by the Plaintiff as a result of the non-payment of these sums and for the detrimental reliance upon false representations made by the Defendant QAF. In addition, Plaintiff has suffered consequential damages as a result of being blacklisted by the QAF, as a result of Plaintiff's discovery of evidence of corruption in a number of acquisitions of defense systems by Qatar.

35.     QAF awarded the Agreement to DSS, and Terms and Conditions were signed by QAF, and the delivery of services under the Agreement commenced shortly thereafter, in or around March 2015. A copy of the final Agreement, including terms and conditions, is appended hereto as Exhibit A, including Annexes A-E.

36.     Pursuant to the terms of the Agreement, DSS agreed to supply the defined Scope of Services and Deliverables and additional consultancy services to the QAF in accordance with the terms of the Agreement. It was an express term of the Agreement that DSS shall perform the Services as specified in the Scope of Work, Article 3.2.

37.     The Scope of Work, which is attached to the Terms and Conditions as Appendix A, provides for the Project to be run as a turnkey project, with eight milestones. Although the Agreement has a term of twelve months, nothing in the Agreement provides that the Agreement terminates at the end of this twelve month period, nor is there a contractual requirement for the Services and Deliverables to be completed by the end of this twelve month period.

38.     Indeed, the Scope of Work clearly indicates that the aim of the Agreement is for the acquisition of the JOC C4I System and accordingly the milestones are described against only an "anticipated delivery time frame" of twelve months. The contract gives the QAF the right to obtain additional consultancy services, which were subsequently agreed upon. On January 10, 2016, the QAF confirmed through Deputy Director of the Falcon Project, Lt. Col. Masser Al-Ghanim, that DSS had met all milestones to date, and that "the project will likely be extended by an additional six months."

39.     Shortly after the QAF signed the contract with DSS, QAF signed an agreement with Raytheon to participate in five joint working groups to learn about and evaluate Raytheon's C4I solution for joint command and control and for other military operation centers. Two of the joint working groups were in Fullerton, California, and three of the joint working groups were in Qatar. Raytheon was seeking a sole source award from the QAF, which was then considering a sole source award to Raytheon.

40.     The consultancy services commenced in March 2015, and continued with two DSS consultants traveling to Fullerton, California for two weeks in May 2015 and another two weeks in July 2015 to provide consultancy services to the QAF and to evaluate Raytheon's C4I system and system functionality for the QAF.  The remainder of the DSS consultants provided advisory services and participated in the working groups in Fullerton, California via a conference link with the three working groups in Qatar. All told, 1150 hours over 143.75 days of consulting services were provided by ten DSS consultants in five joint working groups, and an additional 120 hours over 15 days were provided by seven DSS consultants reviewing Raytheon's Falcon Project Proposal, Raytheon's Proposal, and Thalas' Proposal.

41.     The QAF Falcon Project Committee consisted of well over a dozen officers ranging from the rank of Captain to Brigadier General from all different branches of the Qatar military. The Falcon Project Committee officers also traveled to the United Stated twice in May and July of 2015, and participated in the working groups in Fullerton, California, to evaluate Raytheon's C4I solutions. Raytheon subsequently presented an unsolicited C4I proposal to QAF at the end of the working groups.

---

**COMPLAINT**                                                                                     13

42.     By agreement between the parties, DSS additional consulting services were invoiced between November 2015 and March 2018, in the amount of QAR30,057,335.  As of March 7, 2018, the outstanding balance on these invoices, including interest, expenses, performance and advance payment guarantees is QAR 33,673,832 (US $9,183,415). The outstanding invoices include the work performed by DSS consultants during the working groups in Fullerton, California. To date, the outstanding balance has not been paid. In addition, DSS was never reimbursed tens of thousands of dollars for its expenses for this work, including airline tickets, car rental, meals, and insurance coverage for the consultants and managers in the United States.

43.     Article 29 and 30 of the Consultancy Services Agreement provide that only the QAF, and not DSS, may terminate the agreement for convenience and for default. DSS has no contractual rights of termination. Article 31 of the agreement provides that the QAF may also suspend the performance of the agreement.

44.     However, neither the right to terminate or to suspend the agreement was exercised by the QAF, and DSS was obligated to continue to perform under the Agreement, which included maintaining consultants for the Project.

45.     Notwithstanding some initial expansion of the scope of the Project, milestones 1 to 5 (which comprise Phase One of the Project) were all performed and delivered by DSS in accordance with the terms of the Agreement and within the twenty-six week time frame anticipated. No performance issues were raised and invoices were issued by DSS and duly paid by the QAF. Similarly, milestone 6 was duly performed, invoices submitted and subsequently paid by the QAF. Accordingly, nothing concerning milestones 1 to 6 are part of the dispute between the QAF and DSS.

46.     Thereafter, however, significant delays occurred to the Project, either at the specific request of the QAF or as a direct result of its actions or omissions. These delays were caused by a number of different factors, including:

A.     Delays were caused by the Qatar Minister of Defense - specifically by repeatedly changing the Project Director, the individual responsible for the delivery of the overall project for the QAF. In this regard, the Project Director was changed from Brigadier General Hassan Al Ali to Brigadier General Abdul Aziz Al Dossari; then changed back to Brigadier General Hassan Al Ali; and

then to Brigadier General Mohammed Abdul Latif Al-Mannai. Each change caused considerable delays as a result of the new Project Director wanting to learn about the Project and then making changes to the scope of the Project.

B.      Delays were caused by the Emiri Diwan - following the sharp decline in oil prices in 2016, the Qatari government considered the ways in which expenses to all non-World Cup 2022 projects could be cut. In particular, the Emiri Diwan commenced a project review process which resulted in significant delays.

C.      Delays were caused by the Respondent's Tender Committee - in response to requests for further time from third party international defense companies, the QAF granted extensions to proposed deadlines for further tenders, which impacted the Project.

47.      The QAF has confirmed that DSS delivered all milestones on time and has accepted responsibility for these delays, thereby extending the time for DSS' collection of the outstanding invoices.

48.      In particular, the QAF admitted responsibility for the delays in a letter from Brigadier General Mohammed Abdul Latif Al-Mannai, copied to the Qatar Minister of Defense. QAF's Project leadership assured DSS (and its consultants, who are retired military personnel from the United States, United Kingdom, Germany, Pakistan and Canada) on several occasions that DSS would be paid for the Project delays.

49.      As a direct result of the delays, DSS was assured in several meetings including on October 24, 2016 (some 19 months after the start of the Project) that if DSS continued to support the Project, maintaining its operations and performing tasks assigned to DSS, then (i) second and subsequent phases of the Project would take place in due course; (ii) DSS would be entitled to complete its work under the Project; and (iii) DSS would receive payment in full for the outstanding invoices and for the delays which had occurred.

50.      In strict reliance upon these representations, DSS continued to support the Project and to perform those tasks assigned to DSS. Invoices for this work in the amount of QAR 16,087,456 (approximately US $4,419,626) were duly submitted by DSS, but were not paid within the 45-day payment time frame, nor have been paid at any time thereafter.

51.    As a result of (i) DSS seeking payment of invoices to which it is properly entitled through the formal dispute resolution provisions of the agreement; and, as a result of (ii) DSS consultants' disclosing their discovery of evidence of corruption in a number of acquisitions of defense systems by Qatar, DSS has been blacklisted by the QAF and has been prohibited from bidding for, or securing, further work in Qatar.

52.    As a result of the non-payment of the invoices, as well as the blacklisting of DSS by the QAF, DSS has been precluded from performing further operations in Qatar and is no longer doing business.

53.    DSS has sought to settle this dispute by amicable negotiations. A formal notice of dispute was provided on June 9, 2017, and meetings have been arranged and taken place periodically since then, in an attempt to try to resolve matters. The parties have thus far been unable to resolve the dispute.

## FIRST CAUSE OF ACTION

### (Breach of Contract as to all Defendants)

54.    Plaintiff refers to and re-alleges paragraphs 1 through 53, inclusive, and incorporate the same herein by reference as though fully set forth, and alternatively pleads as follows.

55.    As of December 2014, in exchange for valuable consideration, Defendants entered into the Consultancy Services Agreement (Tender No. TAC/PD/DC/S/88/2013-2014)("the Agreement") with DSS in relation to the acquisition of a C4I system (command, control, communications, computers and intelligence system) for the Joint Operations Command, which was referred to by the parties as the Falcon Project ("the Project"), a copy of which is attached as Exhibit A, including Annexes A-E.  Pursuant to the terms of the Agreement, DSS agreed to supply the defined Scope of Services and Deliverables and additional consultancy services to the QAF in accordance with the terms of the Agreement. Therein, the Defendants agreed to pay the invoiced amount of QAR 16,087,456 (approximately US $4,419,626) for the defined Scope of Services and Deliverables and additional consultancy services.

56.    Plaintiff performed all obligations under the Consultancy Services Agreement with Defendants for the invoiced work.

57.     To date, Defendants have not paid the invoiced amount of QAR 16,087,456 (approximately US $4,419,626) for the agreed upon additional consultancy services.

58.     As a proximate result of Defendants' breach of the Consultancy Services Agreement, the Plaintiff has incurred compensatory and consequential damages, costs, expenses and attorneys' fees, and other adverse financial consequences and damages, in an amount, which with interest, is greater than $4.5 million, which is subject to further proof at trial.

**SECOND CAUSE OF ACTION**

**(Fraudulent Promise as to all Defendants)**

59.     Plaintiff refers to and re-alleges paragraphs 1 through 58, inclusive, and incorporates the same herein by reference as though fully set forth, and alternatively pleads as follows.

60.     At various times since October 2016, Defendants intentionally misrepresented to Plaintiff that they would pay for the additional consultancy services for the QAF in accordance with the terms of the above described Consultancy Services Agreement. These misrepresentations were made both in writing and orally, through means electronic and mechanical, via Defendants' principals and agents, including, but not limited to, the Minister of Defense, Dr. Khalid bin Mohammad Al Attiyah, and others.

61.     These representations and warranties made by Defendants were in fact false. The true facts were that Defendants would not pay for the additional consultancy services for the QAF in accordance with the terms of the above described Consultancy Services Agreement.

62.     Defendants through their principals and agents, made these representations and warranties with knowledge that they were false, and with the intent to induce the Plaintiff to provide the additional consultancy services for the QAF in accordance with the terms of the above described Consultancy Services Agreement. and accept lesser sums in partial payments of Plaintiff's claims than it was due. At the time Defendants made these representations and warranties, the Plaintiff was ignorant of the falsity of Defendants' representations and warranties and believed them to be true. In detrimental reliance upon these representations and warranties, the Plaintiff was induced not to pursue its claims for payment for the additional consultancy services for the QAF in accordance with the terms of the above described Consultancy Services Agreement, and was induced to accept lesser sums in partial payments

of Plaintiff's claims than it was due. and received lesser sums in partial payment of Plaintiff's claims than it was due.

63.     Plaintiff's reliance on Defendants' representations and warranties was justified inasmuch as they represented themselves to be Qatari security and defense professionals with expertise as to Plaintiff's operations, and further represented that they were acting in good faith.

64.     As a proximate result of Defendants' fraudulent misrepresentations and breach of their fiduciary duties, the Plaintiff has incurred costs, expenses and attorneys' fees in the defense of claims made against the Plaintiff, which has further proximately and consequentially resulted in other adverse financial consequences and damages, in an amount believed to be more than $10 million, which is subject to further proof at trial.

65.     At the time the Defendants engaged in the conduct alleged herein, they were guilty of intentional conduct and/or despicable conduct which was carried on by Defendants with, a conscious disregard of the Plaintiff's rights, malice, fraud, or oppression.  Defendants were possessed of the full knowledge as to the rights and interests of the Plaintiff described herein, and acted in reckless indifference and wanton disregard of those rights, and otherwise acted in a despicable manner in doing the acts described herein thereby causing cruel and unusual hardship to the Plaintiffs.  Therefore, Plaintiff is entitled to an award of punitive and exemplary damages against the agencies and instrumentalities of the State of Qatar. 28 U.S.C. 1606.

### THIRD CAUSE OF ACTION

### (Negligent Misrepresentation as to all Defendants)

66.     Plaintiff refers to and re-alleges paragraphs 1 through 65, inclusive, and incorporates the same herein by reference as though fully set forth, and alternatively pleads as follows.

67.     At various times since October 2016, Defendants negligently misrepresented to Plaintiff that they would pay for the additional consultancy services for the QAF in accordance with the terms of the above described Consultancy Services Agreement. These misrepresentations were made both in writing and orally, through means electronic and mechanical, via Defendants' principals and agents, including, but not limited to, Dr. Khalid bin Mohammad Al Attiyah, and others.

68.     These representations and warranties made by Defendants were in fact false. The true facts were that Defendants would not pay for the additional consultancy services for the QAF in accordance with the terms of the above described Consultancy Services Agreement.

69.     Defendants, through their principals and agents, made these representations and warranties with no reasonable grounds for believing them to be true, and with the intent to induce the Plaintiff not to pursue its' claims for payment for the additional consultancy services for the QAF in accordance with the terms of the above described Consultancy Services Agreement, and to accept lesser sums in partial payment of Plaintiff's claims than it was due. At the time Defendants made these negligent misrepresentations and warranties, the Plaintiff was ignorant of the falsity of Defendants' representations and warranties and believed them to be true. In detrimental reliance upon these negligent representations and warranties, the Plaintiff was induced not to pursue its claims for payment of the additional consultancy services for the QAF in accordance with the terms of the above described Consultancy Services Agreement, and received lesser sums in partial payment of Plaintiff's claims than it was due.

70.     Plaintiff's reliance on Defendants' negligent representations and warranties was justified inasmuch as Defendants represented themselves to be Qatar security and defense professionals with expertise as to Plaintiff's operations, and further represented that they were acting in good faith.

71.     As a proximate result of Defendants' negligent misrepresentations and breach of their fiduciary duties, the Plaintiff has incurred damages, costs, expenses and attorneys' fees in the defense of claims made against the Plaintiff, which has further proximately and consequentially resulted in other adverse financial consequences and damages, in an amount believed to be more than $10 million, which is subject to further proof at trial.

**FOURTH CAUSE OF ACTION**

**(Unjust Enrichment as to all Defendants)**

72.     Plaintiff refers to and re-alleges paragraphs 1 through 71, inclusive, and incorporates the same herein by reference as though fully set forth, and alternatively pleads as follows.

73.     Defendants wrongfully secured the above described consulting services and other benefits from DSS, which would be unconscionable for them to retain, and were otherwise unjustly

COMPLAINT

19

1  enriched during the time in which the above described wrongful practices occurred, to the detriment of

2  DSS. Defendants obtained the benefit from DSS by fraud or the taking of an undue advantage.

3  Defendants profited by engaging in the wrongful conduct set forth in this Complaint. Defendants also

4  wrongfully converted funds belonging to DSS. As a result, Plaintiff seeks recovery of Defendants' ill-

5  gotten gains and profits obtained at Plaintiff's expense.

6       74.    Defendants' enrichment is directly and causally related to the detriment of DSS.

7       75.    These benefits were accepted by Defendants under such circumstances that it

8  would be inequitable for these benefits to be retained without payment. As alleged herein, Defendants

9  breached their fiduciary duties and/or abused their positions of control over DSS and therefore

10  Defendants are not justified to retain the benefits conferred upon them.

11       76.    The acts, false representations and wrongful conduct of Defendants damaged

12  Plaintiff financially. As a direct and proximate result of Defendants' unjust enrichment and having and

13  receiving the consultancy services, Plaintiff has been damaged in an amount reasonably believed to be in

14  excess of $4.5 million, and has sustained, and will continue to sustain, monetary damages, including

15  interest, in an amount to be determined according to proof at time of trial.

16       77.    The aforementioned acts of Defendants, and each of them, were intentional,

17  wilful, wanton, malicious, fraudulent, oppressive, in conscious disregard of Plaintiff's rights, were

18  undertaken by them with the intent to injure Plaintiff, and constituted despicable conduct that subjected

19  Plaintiff to creul and unjust hardship also in conscious disregard of Plaintiff's rights so as to justify an

20  award of punitive and exemplary damages pursuant to Cal. Civil Code §3294.  Defendants were

21  possessed of the full knowledge as to the rights and interests of the Plaintiff described herein and

22  Defendants acted in reckless indifference to and with wanton disregard of Plaintiff's rights in doing the

23  acts described herein. By reason of these act, Plaintiff is entitled to punitive and exemplary damages

24  against the agencies and instrumentalities of the State of Qatar in an amount according to proof at the

25  time of trial, and in order to deter said Defendants and others similarly situated from similar unlawful

26  conduct in the future.

27

28

---

**COMPLAINT**         20

**FIFTH CAUSE OF ACTION**

**(Unfair Competition Violation of Business and Professions Code §17200 et seq.,**

**as to all Defendants)**

78.     Plaintiff refers to and re-alleges paragraphs 1 through 77, inclusive, and incorporates the same herein by reference as though fully set forth, and alternatively pleads as follows.

79.     This cause of action is brought by reason of Plaintiff having sustained actual harm and injury in fact resulting from the unlawful, unfair and fraudulent business practices on the part of the Qatar Defendants, and each of them.  Plaintiff has been directly harmed and affected by the unlawful, unfair and fraudulent business practices conducted by the Qatar Defendants, and each of them, within the last four years. Said conduct further violates public policy and is unethical, fraudulent, oppressive, and injurious to persons seeking to utilize the Plaintiff's consultancy services.

80.     On or about March 21, 2018, the MOD unlawfully, unfairly and fraudulently instructed DSS to cease all efforts to both arbitrate this dispute and prosecute said causes of action against the Qatar Defendants, and threatened that if such instructions were not followed, DSS and its shareholders would be subjected to sanctions and reprisal by the State of Qatar.

81.     Plaintiff seeks the statutory remedies of Cal. Business & Professions Code Section 17200 et seq., including, but not limited to, restitution and disgorgement of all monies paid or to be paid pursuant to the Consultancy Services Agreement, resulting from the Qatar Defendants' unfair, unlawful, fraudulent conduct.

82.     Plaintiff has demanded that the Qatar Defendants cease and desist from engaging in the unfair business practices and unlawful conduct described herein; yet despite such demand said Defendants have failed and refused, and continue to fail and refuse, to cease and desist from  all efforts to prevent the arbitration and/or litigation of this dispute.

83.     Plaintiff is informed and believes and thereon alleges that as a direct and proximate result of the aforementioned unfair, unlawful and fraudulent acts and practices on their part, the Qatar Defendants wrongfully withheld at least $4.5 million of monies acquired by means of unfair competition, belonging to the Plaintiff, which has resulted in the unjust enrichment of said Defendants at the expense of the Plaintiff. As a direct result thereof, Plaintiff is entitled to restoration and restitution of

1   all illegally withheld monies, and requests that this court issue an order requiring said Defendants, and

2   each of them, to restore and return all such amounts to the Plaintiff.

3         84.    Plaintiff hereby requests that this Court issue an order requiring the Qatar

4   Defendants to disgorge all such unlawfully, unfairly and fraudulently acquired amounts to Plaintiff.

5         85.    As a result of the foregoing alleged unfair, unlawful, and fraudulent business

6   practices on the part of the Qatar Defendants, Plaintiff is entitled to a temporary restraining order,

7   preliminary injunction and permanent injunction, enjoining the Qatar Defendants from allowing the

8   dissolution of DSS, before the claims in this action are resolved and all creditors of DSS are fully

9   satisfied.

10        86.    In doing the things alleged herein on the part of the agencies and instrumentalities

11  of Qatar, they acted despicably, with malice, fraud and oppression, and wilfully intended to defraud and

12  cause injury to Plaintiff in conscious disregard of Plaintiff's rights under the Consultancy Services

13  Agreement, thereby justifying an award of punitive and exemplary damages against the agencies and

14  instrumentalities of the State of Qatar in an amount appropriate to punish said Defendants and to deter

15  others from engaging in similar conduct.

16        87.    In the event the Plaintiff is successful in the prosecution of this action, then the

17  Plaintiff is entitled to the recovery of its attorneys' fees and costs in accordance with Cal. Code of Civil

18  Procedure Section 1021.5 in that the prosecution of this action will likely result in the enforcement of an

19  important right affecting the public interest and because a significant benefit will have been conferred on

20  the general public by reason of this action.

21  **SIXTH CAUSE OF ACTION**

22  **(Interference with Prospective Economic Advantage as to all Defendants)**

23        88.    Plaintiff refers to and re-alleges paragraphs 1 through 87, inclusive, and

24  incorporates the same herein by reference as though fully set forth, and alternatively pleads as follows.

25        89.    Plaintiff enjoyed and economically benefitted from, and continues to enjoy and

26  benefit from, its prospective economic relationships with its consultancy clients, including the State of

27  Qatar and its MOD, QAF, and MOEC, vendors, consultants, and defense contractors in the United

28  States, United Kingdom, Germany, Pakistan, and Canada with respect to advisory and consultancy

COMPLAINT                                                                22

services for the acquisition of command, control, communications, computers and intelligence systems, with regard to the following projects: Falcon Project Phase 2, QAR 124,915, 234 (U.S. $34,223,352), Tactical Data Link Advisory Services, QAR 5,868,720 (U.S. $1,607,868), Joint Electronic Warfare Advisory Services, QAR 23,034,146 (U.S. $6,310,725), and Consultancy Services for Acquisition of Corvette Naval ships, QAR 112,423,711 (U.S. $30,801,017).

90.     At all relevant times, the Qatar Defendants had actual knowledge of Plaintiff's actual and prospective economic relationships with its consultancy clients, including the State of Qatar and its MOD, QAF, and MOEC, vendors, consultants, and defense contractors in the United States, United Kingdom, Germany, Pakistan, and Canada with respect to the acquisition of command, control, communications, computers and intelligence systems, with regard to the following projects: Falcon Project Phase 2, QAR 124,915, 234 (U.S. $34,223,352), Tactical Data Link Advisory Services, QAR 5,868,720 (U.S. $1,607,868), Joint Electronic Warfare Advisory Services, QAR 23,034,146 (U.S. $6,310,725), and Consultancy Services for Acquisition of Corvette Naval ships, QAR 112,423,711 (U.S. $30,801,017).

91.     The Qatar Defendants, and each of them, intentionally interfered with the aforesaid actual and prospective economic relationships of the Plaintiff by blacklisting DSS from being awarded these projects and any other work in Qatar, and by doing other and further things and/or acts not presently known or ascertained by Plaintiff which things and/or acts have directly and intentionally interfered with Plaintiff's economic relationships. When the true extent of the acts of interference on the part of said Defendants are ascertained, Plaintiff will seek leave to amend this Complaint accordingly.

92.     The acts of interference, false representations, and conduct of the Qatar Defendants, and each of them, successfully interfered with, and greatly disrupted Plaintiff's actual and prospective economic relationships with its consultancy clients, including the State of Qatar and its MOD, QAF, and MOEC, vendors, consultants, and defense contractors in the United States, United Kingdom, Germany, Pakistan, and Canada with respect to the acquisition of command, control, communications, computers and intelligence systems, with regard to the following projects: Falcon Project Phase 2, QAR 124,915, 234 (U.S. $34,223,352), Tactical Data Link Advisory Services, QAR 5,868,720 (U.S. $1,607,868), Joint Electronic Warfare Advisory Services, QAR 23,034,146

(U.S. $6,310,725), and Consultancy Services for Acquisition of Corvette Naval ships, QAR 112,423,711 (U.S. $30,801,017).

93.     As a direct and proximate result of the Qatar Defendants intentional interference with said Plaintiff's prospective economic relationships, Plaintiff has sustained and will continue to sustain, monetary damages in a sum in excess of $10 million, to be determined according to proof at the time of trial.

94.     The aforementioned acts of said Defendants, and each of them, were wilful, wanton, malicious and oppressive, and were undertaken by them with the intent to injure said Plaintiff and constituted despicable conduct that subjected said Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights so as to justify an award of punitive and exemplary damages as to the agents and instrumentalities of the State of Qatar.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief as to all Defendants)

95.     Plaintiffs refer to and re-allege paragraphs 1 through 94, inclusive, and incorporate the same herein by reference as though fully set forth, and alternatively plead as follows.

96.     An actual controversy has arisen and now exists between Plaintiff and Defendants regarding their respective rights, statutory, fiduciary and contractual duties and obligations in that Plaintiff contends that Defendants are liable to Plaintiff pursuant to the Consultancy Services Agreement. Defendants contend that they are not liable to Plaintiff.

97.     Plaintiff desires a judicial determination of the respective rights of Plaintiff and Defendants, and in particular, desire a declaration of Defendants' responsibility pursuant to the Consultancy Services Agreement to pay for the additional consultancy services delivered by DSS to the MOD and QAF.

98.     As a result of the unfair, unlawful and fraudulent conduct of Lt. Col. Al-Mannai and Abdulsalam Abu-Issa, conspired with the MOD to prevent the arbitration of this dispute, and directing, receiving and facilitating the unauthorized payments by a U.S. third party defense contractor of QAR 7,006,750 (US $1,924,931), for no lawful consideration, to a member of the Royal Family, Plaintiff is entitled to an injunction requiring any settlement of these claims be supervised by the Court in

order to insure proportional payment of any liquidated claims to all creditors of DSS according to their equitable interests, after offset for any liabilities incurred.

99.     Such a declaration is necessary and appropriate at this time so that the parties may ascertain their rights and duties with respect to each other.

## DEMAND ALLEGATIONS

100.     On or about June of 2017, the DSS Board of Directors began to make efforts to to pursue the above claims against the Qatar Defendants, including the GOVERNMENT OF THE STATE OF QATAR, by and through its MOD and QAF. All 3 members of the board of directors approved the retention of Cooley (UK) LLP, and subsequently agreed to pay, and paid Cooley (UK) LLP for legal services to prosecute the causes of action herein, pursuant to Article 56 of the Consultancy Services Agreement.

101.     On or before, March 21, 2018, Plaintiff informed the board of directors in writing of the ultimate facts of each cause of action herein alleged and demanded that the board of directors take such action as is necessary for the corporation to prosecute the causes of action against the Qatar Defendants. On April 15, 2018, the board of directors and the corporation refused and continue to refuse, to prosecute this action and Plaintiff's efforts to obtain such action have failed because the other 2 members of the board of directors, one of whom is an officer in the QAF, were instructed by the MOD to cease all efforts to both arbitrate this dispute and prosecute said causes of action against the Qatar Defendants, and were further instructed that if such instructions were not followed, DSS and its shareholders would be subjected to sanctions and reprisal by the State of Qatar.

102.     On June 8, 2018, Plaintiff having been specifically authorized pursuant to Article 721 of the Qatar Civil Law No. (22) of 2004, Article 7 of the Articles of Association, and Article 719 of the Qatar Civil Law No. (22) of 2004, authorizing acts of management in preserving, maintaining, and collecting the rights and settling the debts of the company, filed a Request for Arbitration of the causes of action herein, before the International Chamber of Commerce International Court of Arbitration, pursuant to Article 56 of the Consultancy Services Agreement.

103.     On August 30, 2018, 2 of the 3 members of the Board of Directors, through counsel at Dentons, prevented the requested arbitration, and thereafter sought to terminate the retention

of Cooley (UK), LLP, and unlawfully attempted to remove Plaintiff as a manager, director and board member of DSS. As a result, DSS is entitled to the costs of the arbitration proceeding, including the attorneys fees of counsel before the ICC International Court of Arbitration.

104.    During late September of 2018, while 2 of the 3 members of the Board of Directors were preventing the requested arbitration, the MOD became aware that Lt. Col. Al-Mannai and AbdulSalam Abu-Issa, directed, received, and facilitated unauthorized payments by a U.S. third party defense contractor of QAR 7,006,750 (US $1,924,931), for no lawful consideration, to a member of the Royal Family.

105.    Between November 1, 2018 , in an apparent quid pro quo to avoid prosecution for which they could be charged for having directed, received and facilitated these bribes, Lt. Col. Al-Mannai and AbdulSalam Abu-Issa, in breach of their fiduciary duty to DSS, further agreed to accept the QAF's transfer of only QAR 9,021,550 (U.S. $2,471,658) to DSS in exchange for their continuing refusal to prosecute the causes of action in this action on behalf of DSS for the remaining outstanding balance of QAR 16,087,456 (U.S. $4,419,626).

106.    In so refusing to prosecute this action the board of directors did not act in good faith or in any reasonable belief that its refusal to commence this action was good business judgment or in the best interest of the corporation. Rather, this refusal by the board of directors was in the exercise of bad faith and breach of its fiduciary duty to maintain and defend the interests of the corporation.

107.    The other 2 members of the DSS Board of Directors personally profited from the wrongdoing alleged in this Complaint.  They also lack the objectivity to judge their own misconduct. Accordingly, a majority of the Board engaged in the wrongdoing and have interests adverse to prosecuting these claims on behalf of DSS in a fair and unbiased manner. Thus, the DSS Board of Directors could not exercise independent objective judgment in deciding whether to bring this action nor in vigorously prosecuting the claims alleged herein.

108.    Despite having knowledge of the history of the Qatar Defendants' misconduct and the other 2 members of the DSS Board of Directors having facilitated unauthorized  payments by third parties to a member of the Royal Family, the current Board of Directors has failed and refused to seek recovery for DSS for any of the causes of action for the misconduct alleged herein.

109.    The majority of the directors cannot be relied upon to reach a truly independent decision whether to commence the demanded action against themselves, the officers, and the Qatar Defendants responsible for the misconduct alleged in this Complaint, because, among other things, the Board is currently dominated by 2 of 3 Directors, who were personally and directly involved in the acts of mismanagement, abuse of control and waste alleged and who each approved the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede.

110.    The DSS Board's domination by these 2 of 3 directors inhibits the Board's ability to validly exercise their business judgment and render them incapable of reaching an independent decision whether to accept any demand by Plaintiff to address the wrongs detailed herein, as exemplified by their inaction in the years since the wrongdoing began.  The 2 of 3 members of the Board of Directors are biased and cannot appropriately and fairly adjudicate any demand on the Board.

111.    If Plaintiff is successful in this action, a substantial benefit will result to the nominal defendant DSS corporation on whose behalf this action is prosecuted and Plaintiff is entitled to recover the attorneys' fees and costs incurred herein. As a result of the unfair, unlawful and fraudulent conduct of Lt. Col. Al-Mannai and Abdulsalam Abu-Issa, preventing the arbitration of this dispute, and directing, receiving and facilitating the unauthorized payments by a U.S. third party defense contractor of QAR 7,006,750 (US $1,924,931), for no lawful consideration, to a member of the Royal Family, Plaintiff is entitled to an injunction requiring any settlement of these claims be supervised by the Court in order to insure proportional payment of any liquidated claims to all creditors of DSS according to their equitable interests, after offset for any liabilities incurred.

**WHEREFORE**, Plaintiff prays judgment against Defendants, the government of THE STATE OF QATAR, by and through its MOD, QAF and MOEC, as follows:

1.    For an award of actual, compensatory, and consequential monetary damages against all Defendants, jointly and severally, in an amount to be determined according to proof at time of trial;

2.    For an award of restitution and disgorgement of all illicit proceeds generated as a result of the wrongful conduct alleged herein;

3.  For an award of pre-judgment interest at the maximum legal rate on all sums awarded;

4.  For an award of reasonable attorneys fees and costs of suit incurred herein;

5.  For an award of punitive and exemplary damages;

6.  For a declaration of the parties respective rights and liabilities pursuant to their agreements, statutory and common law duties to one another;

7.  For an injunction requiring any settlement of these claims be supervised by the Court in order to insure proportional payment of any liquidated claims to all creditors of DSS according to their equitable interests, after offset for any liabilities incurred;

8.  For such other and further relief as this Court may deem to be fair, just and proper.

Dated: September 25, 2019                    **WEBB & CAREY APC**


/s/Patrick D. Webb
Patrick D. Webb
Attorneys for Plaintiff Tarek A. Fouad, derivatively on behalf of DIGITAL SOULA SYSTEMS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**