KEVIN WALSH (*pro hac vice* pending)
kevin.walsh@dlapiper.com
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Fl
New York, NY 10020-1104
Tel:   212.335.4500
Fax:   212.335.4501

AMANDA C. FITZSIMMONS (Bar No. 258888)
amanda.fitzsimmons@dlapiper.com
MANDY CHAN (Bar No. 305602)
mandy.chan@dlapiper.com
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel:   619.699.2700
Fax:   619.699.2701

COLLEEN MCELROY (Bar No. 307490)
colleen.mcelroy@dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-4704
Tel:   310.595.3000
Fax:   310.595.3300

Attorneys for Specially Appearing Defendants
THE STATE OF QATAR; MINISTRY OF
DEFENSE; QATAR ARMED FORCES; and
MINISTRY OF ECONOMY AND COMMERCE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| TAREK A. FOUAD, derivatively on behalf of nominal defendant DIGITAL SOULA SYSTEMS,<br><br>                    Plaintiff,<br><br>        v.<br><br>THE STATE OF QATAR, by and through its MINISTRY OF DEFENSE, QATAR ARMED FORCES, MINISTRY OF ECONOMY AND COMMERCE, and DOES 1-30,<br><br>                    Defendants. | CASE NO. 8:19-CV-01837-RGK-ADS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SPECIALLY APEARING DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**<br><br>Date:   February 24, 2020<br>Time:   9:00 a.m.<br>Crtrm:  850<br>Judge:  Hon. R. Gary Klausner |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................. 1

II.   FACTUAL BACKGROUND .................................................................. 1

     A.    The State of Qatar and the Falcon Project. ........................................ 2

     B.    Tarek Fouad and Digital Soula Systems. ........................................... 3

     C.    A dispute arises over payments and Fouad embarks on litigation campaign without DSS's authorization. ............................................. 3

     D.    DSS and the Qatar Armed Forces execute a settlement agreement. ......................................................................................... 5

     E.    Fouad ignores the parties' settlement and initiates this case. .............. 6

III.  LEGAL STANDARD ............................................................................ 6

     A.    Lack of subject matter jurisdiction and personal jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2). ............................................................................................ 6

          1.    The Foreign Sovereign Immunities Act ("FSIA"). .................. 6

          2.    Standing to bring a derivative action. ....................................... 7

     B.    Motion to dismiss for forum non conveniens. ................................... 7

     C.    Failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ......................................................................... 8

IV.  ARGUMENT ....................................................................................... 8

     A.    The Court lacks subject matter jurisdiction over this dispute because the Sovereign Defendants are immune from suit. .................. 8

          1.    The implied waiver exception does not apply. .......................... 9

          2.    The commercial activity exception does not apply. ................. 10

               a.    The Sovereign Defendants did not engage in "commercial activity." ................................................. 10

               b.    Fouad's action is not "based upon" a commercial activity carried on in the United States. ........................ 13

               c.    Fouad's action is not "based upon" a U.S. act in connection with a commercial activity elsewhere. ....... 15

               d.    Fouad's action is not "based upon" an act outside the U.S. that caused a direct effect in the U.S. .............. 15

i

|  |  | 3. | The arbitration exception does not apply. ................................ 17 |
|  | **B.** | None of the exceptions apply to the State of Qatar and its ministries, which are unconnected to the underlying dispute. ........... 17 |
|  | **C.** | The Court lacks subject matter jurisdiction over this dispute because Fouad lacks standing to bring a derivative claim. ................ 17 |
|  | **D.** | Plaintiff cannot establish personal jurisdiction over the Defendants. ..................................................................................... 18 |
|  | **E.** | This Court is not a proper forum. ........................................................ 19 |
|  | **F.** | The Complaint fails to state a claim for relief. .................................. 20 |
| **V.** | CONCLUSION ........................................................................................... 20 |

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adler v. Fed. Republic of Nigeria*,
 107 F.3d 720 (9th Cir. 1997) ......................................................... 16, 17

*Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*,
 267 F.3d 30 (1st Cir. 2001) ................................................................ 20

*Argentine Republic v. Amerada Hess Shipping Corp.*,
 488 U.S. 428 (1989) ............................................................................ 6

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ........................................................................ 8, 16

*ASUS Computer Int'l v. InterDigital, Inc.*,
 No. 15-CV-01716-BLF, 2015 WL 5186462 (N.D. Cal. Sept. 4,
 2015) ................................................................................................ 20

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
 571 U.S. 49 (2013) ........................................................... 7, 8, 19, 20

*Batchelder v. Kawamoto*,
 147 F.3d 915 (9th Cir. 1998) ............................................................ 18

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ........................................................................ 8, 16

*Bucur v. FedEx Ground Package Sys. Inc.*,
 No. SACV 15-01117 JGB, 2015 WL 13285090 (C.D. Cal. Sept. 10,
 2015) .................................................................................................. 2

*Butters v. Vance International, Inc.*,
 225 F.3d 462 (4th Cir. 2000) ............................................................ 13

*Cassirer v. Kingdom of Spain*,
 461 F. Supp. 2d 1157 (C.D. Cal. 2006), *aff'd in part and rev'd in
 part*, 616 F.3d 1019 (9th Cir. 2010) .............................................. 19

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
 2017 F.3d 1126 (9th Cir. 2000) ........................................................ 20

*Cicippio v. Islamic Republic of Iran*,
   30 F. 3d 164 (D.C. Cir. 1994).................................................................. 13

*Coleman v. Am. Honda Fin. Corp.*,
   No. SACV 18-2295 JVS, 2019 WL 4456002 (C.D. Cal. June 7,
   2019) .......................................................................................................... 2

*Davis v. HSBC Bank Nevada, N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ................................................................... 1

*Davoyan v. Republic of Turkey*,
   116 F. Supp. 3d 1084 (C.D. Cal. 2013)................................................... 16

*Dean Witter Reynolds v. Byrd*,
   470 U.S. 213 (1985) ................................................................................. 20

*Eringer v. Principality of Monaco*,
   2011 WL 13134271 (C.D. Cal. Aug. 23, 2011), *aff'd*, 533 F. App'x
   703 (9th Cir. 2013) ................................................................................... 13

*Gen. Elec. Capital Corp. v. Grossman*,
   991 F.2d 1376 (8th Cir. 1993) ................................................................. 15

*Intercontinental Indus. Corp. v. Wuhan State Owned Indus.*
   *Holdings Co., Ltd.*,
   726 Fed. Appx. 619 (9th Cir. 2018) ........................................................ 13

*In re Yahoo Mail Litig.*,
   7 F. Supp. 3d 1016 (N.D. Cal. 2014)......................................................... 8

*Ipitrade Intern., S.A. v. Federal Republic of Nigeria*,
   465 F. Supp. 824 (D.D.C. 1989).............................................................. 10

*Jin v. Ministry of State Sec.*,
   557 F. Supp. 2d 131 (D.D.C. 2008) ........................................................ 13

*Joseph v. Office of Consulate Gen. of Nigeria*,
   830 F.2d 1018 (9th Cir. 1987).................................................................... 9

*M.B.L. Intern. Contractors, Inc. v. Republic of Trinidad and Tobago*,
   725 F. Supp. 52 (D.D.C. 1989).................................................................. 9

*Manetti–Farrow, Inc. v. Gucci America, Inc.*,
   858 F.2d 509 (9th Cir. 1988)...................................................................... 8

*Maritime Int'l Nominees Establishment v. Republic of Guinea*,
    693 F.2d 1094 (D.C. Cir. 1982).................................................................... 14, 15

*Meadows v. Dominican Republic*,
    817 F.2d 517 (9th Cir. 1987) ............................................................................ 7

*Morgan Equipment Co. v. Novokrivorogsy State Ore Min. and*
    *Processing Enterprise*,
    57 F. Supp. 2d 863 (N.D. Cal. 1998)................................................................ 15

*OBB Personenverkehr AG v. Sachs*,
    136 S. Ct. 390 (2015).......................................................................................... 6

*Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*,
    No. CV 15-9704-JFW (ASX), 2016 WL 3563504 (C.D. Cal. Mar. 9,
    2016), *aff'd*, 899 F.3d 1081 (9th Cir. 2018) ...................................................... 14

*Practical Concepts, Inc. v. Republic of Bolivia*,
    811 F.2d 1543 (D.C. Cir. 1987).......................................................................... 11

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992) ................................................................................... 11, 17

*Sampson v. Fed. Republic of Germany*,
    250 F.3d 1145 (7th Cir. 2001) ............................................................................ 7

*Sarandi v. Breu*,
    No. C 08-2118, 2009 WL 2871049 (N.D. Cal. Sept. 2, 2009).............................. 7

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ............................................................................................ 7

*Schermerhorn v. Israel*,
    876 F.3d 351 (D.C. Cir. 2017).............................................................................. 7

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,*
    *Kommanditgesellschaft v. Navimpex Centrala Navala*,
    989 F.2d 572 (2d Cir. 1993) ................................................................................ 9

*Shwarz v. United States*,
    234 F.3d 428 (9th Cir. 2000) ................................................................................ 2

*Siderman de Blake v. Republic of Argentina*,
    965 F.2d 699 (9th Cir. 1992) ....................................................................... 6, 15

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
   549 U.S. 422 (2007) ........................................................................ 8

*Stati v. Republic of Kazakhstan*,
   199 F. Supp. 3d 179 (D.D.C. 2016) ................................................ 9

*Terenkian v. Republic of Iraq*,
   694 F.2d 1122 (9th Cir. 2012) ................................................. 14, 16

*UNC Lear Services, Inc. v. Kingdom of Saudi Arabia*,
   581 F.3d 210 (5th Cir. 2009) .................................................. 12, 13

*Warth v. Seldin*,
   422 U.S. 490 (1975) ....................................................................... 7

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ....................................................... 7

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
   901 F.3d 1081 (9th Cir. 2018) ..................................................... 19

*Zedan v. Kingdom of Saudi Arabia*,
   849 F. 2d 1511 (D.C. Cir. 1988) .................................................. 15

**Federal Statutes**

28 U.S.C.
   § 1330(a)-(b) ................................................................................... 7
   § 1603(d) ................................................................................. 10, 11
   § 1604 ....................................................................................... 7, 8
   § 1605(a)(1) .................................................................................... 8
   § 1605(a)(2) ............................................................... 9, 10, 15, 16
   § 1605(a)(6) ............................................................................. 9, 17

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(1) ............................... 6, 7, 20

Federal Rule of Civil Procedure 12(b)(6) ..................................... 8

Foreign Sovereign Immunities Act ....................................*passim*

FSIA House Report,
   U.S.C.C.A.N. 6604 (1976) ........................................................ 15

## I.      **INTRODUCTION**

The claims asserted by Tarek Fouad ("Fouad") are fatally flawed and must be dismissed. The State of Qatar and its ministries and armed forces (the "Sovereign Defendants") are immune from suit. And the breach of contract and related claims asserted by Fouad, ostensibly in a derivative capacity on behalf of Digital Soula Systems ("DSS"), a Qatari limited liability company which provides defense and security services, are in any event spurious, since DSS has released any claims it might have had pursuant to a comprehensive settlement agreement. This settlement agreement, moreover, requires the resolution of all disputes in the courts of Qatar under Qatari law.

Fouad has, in fact, already sought relief on three prior occasions for these meritless claims: he has initiated, and then withdrawn, two procedurally defective arbitration proceedings before the International Chamber of Commerce ("ICC"), as well as a separate claim before the English High Court. The filing of this action, which bears no connection whatsoever to the forum, is merely another chapter in a campaign of vexatious and meritless litigation.

Multiple grounds thus require dismissal of this case: the Sovereign Defendants are immune from suit; Fouad lacks authority to bring derivative or indeed any claims on behalf of DSS; and this is not a proper forum. For these reasons and those set forth below, the Sovereign Defendants respectfully request that the Court dismiss the Complaint with prejudice.

## II.     **FACTUAL BACKGROUND**[1]

---

[1] Although Fouad purports to rely on certain documents which form the basis of his claims, he has failed to append them to his complaint, and quotes from them in selective and misleading ways. The Sovereign Defendants provide complete copies of these documents herein, including the Settlement Agreement between DSS and the Qatar Armed Forces, the Articles of Association for DSS, and the Shareholder Agreement, attached as Exhibits 1 through 3 to the Northmore-Ball Declaration, respectively. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir.

## A.     The State of Qatar and the Falcon Project.

The State of Qatar is a sovereign nation located in the Arabian Gulf. The Qatari Ministry of Defense and the Qatari Armed Forces are the organs of state responsible for maintaining Qatar's defensive capabilities and for coordinating with other ministries and agencies charged with national security responsibilities.

In 2014, the Qatar Armed Forces began to undertake measures to upgrade its command and control and electronic warfare systems. Modernization of these systems (known colloquially as the "C4I System") was deemed essential to increase Qatar's situational awareness in combat, to improve battle management capabilities, and to increase mission effectiveness, operational readiness, and threat deterrence "by providing extensive new capability and upgraded automation of the command and control process." Consultancy Agreement, Compl., Ex. A, at Annex A, § A(2), Docket Entry 1-1 (p. 9). The new C4I system would integrate the operations of the Qatar Armed Forces, security agencies and civilian/critical infrastructure authorities to facilitate their interaction with one another in times of peace and war.

The Qatar Armed Forces required expert assistance to implement this program—dubbed the "Falcon Project"—and thus entered into a contract with DSS for consultancy services in December 2014. Among other services, DSS undertook to identify all C4I system requirements and to conduct "system performance analysis." Consultancy Agreement, Annex A, § A(3.2), Docket Entry 1-2 (p. 13).

---

2012) (quotation omitted). The Sovereign Defendants also append complete copies of other documents selectively quoted or referenced in the Complaint or otherwise judicially noticeable relating to official arbitration proceedings before the ICC and the English High Court, attached as Exhibits 4 through 13 to the Northmore-Ball Declaration. *See, e.g.*, *Bucur v. FedEx Ground Package Sys. Inc.*, No. SACV 15-01117 JGB (KKX), 2015 WL 13285090, at *1 n.2 (C.D. Cal. Sept. 10, 2015) (taking judicial notice of various records and filings from earlier litigation and arbitration proceedings between the parties); *Coleman v. Am. Honda Fin. Corp.*, No. SACV 18-2295 JVS (ADSX), 2019 WL 4456002, at *1 (C.D. Cal. June 7, 2019). The Court need not assume the truth of any allegation contradicted by judicially noticeable facts. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

DSS also agreed to establish a workspace in Doha, Qatar, where its personnel were to work in close proximity to the Falcon Committee, which had "well over a dozen officers ranging from the rank of Captain to Brigadier General from all different branches of the Qatar military." Compl. ¶¶ 41; Consultancy Agreement, Annex A, § C(1), Docket Entry 1-2 (p. 69). Substantially all, if not all, of DSS's services under the Consultancy Agreement were performed in Qatar. *Id.*; Compl. ¶ 42.

### B.      Tarek Fouad and Digital Soula Systems.

Fouad purports to be a U.S. and British citizen, a California resident, and a 20% shareholder of DSS. Compl. ¶¶ 1-2.  DSS has two other shareholders in addition to Fouad: Al Sedriah Holding Company (60%) and Salam International Investment Ltd. (20%). *Id.* ¶ 2. DSS is managed by Mohammad Hammoudi, who is the liquidator with "full and absolute authority" to act on DSS's behalf. Declaration of Lawrence Northmore-Ball ("Northmore-Ball Decl."), Ex. 4, Docket Entry 30-6. The terms and conditions governing the operations and functioning of DSS are set forth in the Company's Articles of Association, and the relationship between the Company's three shareholders is governed by a Shareholders Agreement. Compl. ¶¶ 1, 3; Northmore-Ball Decl., Exs. 2, 3, Docket Entries 30-4, 30-5.

### C.      A dispute arises over payments and Fouad embarks on litigation campaign without DSS's authorization.

According to the Complaint, sometime in October 2016, the Falcon Project experienced delays and certain invoices issued by DSS went unpaid. Compl. ¶¶ 46, 49.  More than one year later, on June 8, 2018, Fouad, purporting to act on behalf of DSS, filed a Request for Arbitration with the ICC in London, England, ostensibly pursuant to 56.1 of the Consultancy Agreement. In the Request, Fouad sought payment of 20% of those amounts that he claimed were owed to DSS, notwithstanding that DSS was the purported Claimant in the arbitration. Fouad's purported reason for restricting the claim in this way was that this was "a result of only one shareholder seeking compensation for his shareholding." Compl. ¶ 102;

1    Northmore-Ball Decl., Ex. 5, ¶ 31, Docket Entry 30-7.

2          Shortly after Fouad initiated the first arbitration, however, DSS reached a

3    settlement of all claims with the Qatar Armed Forces. In furtherance of the

4    settlement, on August 30, 2018, DSS advised the ICC that Fouad had no authority to

5    file the proceeding on its behalf: the "request [for arbitration] is being brought *ultra*

6    *vires*, and as such is not valid." Compl. ¶ 103; Northmore-Ball Decl., Ex. 6, Docket

7    Entry 30-8. DSS further confirmed that "neither Mr. Tarek Fouad, nor Cooley [the

8    law firm engaged by Fouad] nor Mr. Deem [of Cooley] are authorized to represent

9    the Company in any arbitral proceedings whatsoever, including the current

10   Request." *Id.* DSS therefore informed the ICC "that the Company withdraws the

11   Request immediately and any further proceedings in relation with the Request and

12   arbitration be immediately stopped," and further requested that the ICC

13   "[i]mmediately consider the Request as null and void on the basis that it was falsely

14   presented on behalf of the Company, without the requisite authorizations." *Id.*

15         Contrary to his allegation that this letter "prevented the requested arbitration"

16   (Compl. ¶ 103), Fouad himself, by letter of counsel less than one week later, on

17   September 5, 2018, requested that "the Secretariat . . . take no further steps in

18   relation to the Request for Arbitration until further notice." Northmore-Ball Decl.,

19   Ex. 7, Docket Entry 30-9. Fouad instead elected to institute a judicial action in the

20   United Kingdom: "We will now refer to the English High Court the procedural

21   question of whether the Request has properly been served by DSS; and whether . . .

22   the conflicted position of the fellow shareholders, directors and Dentons properly

23   prevents any attempt to nullify such Request as a matter of arbitral procedure." *Id.*

24         As promised, on October 16, 2018, Fouad sought a declaration in the High

25   Court "affirming" his authority to commence the first arbitration, and authorizing

26   his counsel to "disregard instructions [regarding] their inability to act in the interests

27   of [DSS]." Northmore-Ball Decl., Ex. 8, Docket Entry 30-10. On January 22, 2019,

28   the English High Court struck Fouad's claim on its own motion.  Northmore-Ball

Decl., Ex. 9, Docket Entry 30-11. Shortly thereafter, on February 8, 2019, the ICC issued a notice that Fouad's claims in the first arbitration were "considered withdrawn" as a result of Fouad's failure to pay the requisite advance of costs and closed the proceeding. Northmore-Ball Decl., Ex. 10, Docket Entry 30-12 (citing Article 37(6) of the ICC Rules of Arbitration as basis for closing the arbitration).

Fouad, however, was undeterred. On February 20, 2019, again purporting to act on behalf of DSS, he filed a second Request for Arbitration, again purportedly on behalf of DSS, this time seeking full payment of all amounts allegedly owed under the Consultancy Agreement. Northmore-Ball Decl., Ex. 11, Docket Entry 30-13. Soon thereafter, however, on April 23, 2019, he reversed course yet again, advising the ICC that he was withdrawing the second arbitration "in order to take [the] dispute to the Federal Court of the United States of America." Fouad made clear that this withdrawal was "strictly without prejudice to [his] ability subsequently to reintroduce proceedings before the [ICC]." Northmore-Ball Decl., Ex. 12, Docket Entry 30-14. On May 3, 2019, the ICC terminated this second arbitration as well.  Northmore-Ball Decl., Ex. 13, Docket Entry 30-15.

### D.   DSS and the Qatar Armed Forces execute a settlement agreement.

Two months after Fouad abandoned his second set of arbitral proceedings, DSS and the Qatar Armed Forces memorialized the terms of their earlier settlement in the Settlement Agreement. Under the terms of the Settlement Agreement, DSS accepted payment of QAR 9,021,550

> "in full and final settlement of all claims whatsoever (including claims for interest and costs) which have been made, could have been made, or may be made by each of [DSS] and its Related Parties against Qatar Armed Forces and its Related Parties arising out of, or in any way connected to, the [Consultancy Agreement].  This, includes but is not limited to, the Arbitrations, the English Court Proceedings and the Threatened US Proceedings."

Settlement Agreement, Northmore-Ball Decl., Ex.1, at Art. 5, Docket Entry 30-3. "Related Parties" is specifically defined in the Settlement Agreement to include "a party's parent, subsidiaries, assigns, transferees, principals, officers[,] directors or shareholders," i.e., including, of course, Fouad and each of the Sovereign Defendants. *Id.*, Art. 3.3. The Settlement Agreement also includes a full mutual release and agreement not to sue. *Id.* at Art. 8 (mutual release of all claims); *Id.* at Art. 9.1 (agreement by each party and "related parties" not to sue).

### E.   Fouad ignores the parties' settlement and initiates this case.

In filing this action, Fouad has willfully ignored the fact that DSS's claim against the QAF has been fully and finally settled, as reflected in the Settlement Agreement. And once again, in clear disregard of the governing corporate instruments, he purports to act on behalf of DSS, claiming that he is empowered to do so because he is a valid representative of the Company, and, in any event, the directors of the board are not willing to do so. *Id.* ¶¶ 100-111. The latter statement is, of course, true: the past directors are unwilling to assert these claims because they lack authority to do so and the claims have been resolved by amicable settlement.

## III.   LEGAL STANDARD

### A.   Lack of subject matter jurisdiction and personal jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2).

#### 1.   The Foreign Sovereign Immunities Act ("FSIA").

Before reaching the merits of a claim against a foreign state, a court must determine whether it has jurisdiction under the FSIA. *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 706 (9th Cir. 1992). The FSIA provides "the sole basis" for obtaining jurisdiction over foreign countries in U.S. courts, *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989), and establishes the fundamental principle that foreign states, including their political subdivisions, agencies, and instrumentalities, are not subject to the jurisdiction of U.S. courts unless a specific statutory exception to immunity applies. *OBB Personenverkehr AG*

1  *v. Sachs*, 136 S. Ct. 390, 394 (2015) (citing *Saudi Arabia v. Nelson*, 507 U.S. 349,

2  355 (1993)); *see also* 28 U.S.C. § 1604.

3      A plaintiff seeking to bring a claim against a foreign state thus bears the

4  threshold burden of showing that one of the FSIA's limited exceptions applies.

5  *Meadows v. Dominican Republic*, 817 F.2d 517, 522-23 (9th Cir. 1987). These

6  exceptions are construed narrowly, consistent with the overall statutory objective of

7  preserving the sovereign immunity of foreign states. *See, e.g., Schermerhorn v.*

8  *Israel*, 876 F.3d 351, 358 (D.C. Cir. 2017) ("The FSIA is premised on 'a

9  presumption of foreign sovereign immunity' qualified only by a small number of

10  'discrete and limited exceptions.'" (citation omitted)); *Sampson v. Fed. Republic of*

11  *Germany*, 250 F.3d 1145, 1155-56 (7th Cir. 2001). If the plaintiff fails to meet his

12  burden of proving one of the narrow exceptions applies, a court lacks both subject

13  matter and personal jurisdiction over the sovereign. *See* 28 U.S.C. § 1330(a)-(b).

14          **2.      Standing to bring a derivative action.**

15      Standing is a "threshold question in every federal case, determining the power

16  of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

17  "Because standing and mootness both pertain to a federal court's subject-matter

18  jurisdiction under Article III, they are properly raised in a motion to dismiss under

19  Federal Rule of Civil Procedure 12(b)(1)." *White v. Lee*, 227 F.3d 1214, 1242 (9th

20  Cir. 2000). Such challenges include challenges to a plaintiff's standing to bring a

21  derivative suit. *See Sarandi v. Breu*, No. C 08-2118 SBA, 2009 WL 2871049, at *3

22  (N.D. Cal. Sept. 2, 2009) (noting that a challenge to a plaintiff's standing to bring a

23  derivative suit is "in effect, a challenge to the court's jurisdiction which is properly

24  raised under Rule 12(b)(1) of the Federal Rules of Civil Procedure.").

25          **B.      <u>Motion to dismiss for forum non conveniens.</u>**

26      "[T]he appropriate way to enforce a forum-selection clause pointing to a state

27  or foreign forum is through the doctrine of forum non conveniens." *Atl. Marine*

28  *Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 60 (2013). Federal

law governs the enforceability of a contractual forum-selection clause, *Manetti–Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 513 (9th Cir. 1988), and a district court "has discretion to respond at once to a defendant's forum non conveniens plea, and need not take up first any other threshold objection," including "whether it has authority to adjudicate the cause (subject-matter jurisdiction) or personal jurisdiction over the defendant," *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007). Under controlling federal law, "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases." *Atl. Marine Const.*, 571 U.S. at 63 (alterations omitted).

### C.  Failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

Rule 12(b)(6) requires dismissal where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). The allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Mere 'conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss.'" *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1024 (N.D. Cal. 2014).

## IV.  ARGUMENT

### A.  The Court lacks subject matter jurisdiction over this dispute because the Sovereign Defendants are immune from suit.

The State of Qatar, its Ministries of Defense and Economy and Commerce, and its Armed Forces are sovereign defendants.  Each is entitled to sovereign immunity under the FSIA. 28 U.S.C. § 1604. In the Complaint, Fouad purports to rely upon a number of exceptions to the FSIA—the implied waiver exception, 28

U.S.C. § 1605(a)(1); the commercial activity exception, 28 U.S.C. § 1605(a)(2); and the arbitration exception, 28 U.S.C. § 1605(a)(6). None of these exceptions apply.

### 1.      The implied waiver exception does not apply.

Fouad first claims that the Sovereign Defendants have waived their immunity "either explicitly or by implication." Compl. ¶ 16. He has, however, conspicuously failed to allege any facts that evidence any waiver of any sort. Nor, of course, was there any such waiver.

Fouad appears to believe that the mere existence of an arbitration agreement triggers the implied waiver exception. But the relevant authority states otherwise. The exception applies only in those cases "where an agreement contemplates adjudication of a dispute by the United States courts." *Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1023 (9th Cir. 1987). Here, the Consultancy Agreement could not be more explicit: it calls for arbitration under the rules of the ICC, provides for the seat of the arbitration to be in London, England, and specifies that the laws of Qatar govern any dispute. Consultancy Agreement, Compl., Ex. A, Art. 56.1 & 56.2, Docket Entry 1-1 (p. 56). Plainly, the Sovereign Defendants never contemplated the adjudication of any dispute by a U.S court.

Cases cited by Fouad in his Complaint do not compel a different conclusion. Although it is true that the courts in those cases found waiver based on the parties' agreement to arbitrate their disputes in a country that is a signatory to the New York Convention, those courts did so only in the context of an action to ***enforce or affirm an arbitration award***. *See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 578-79 (2d Cir. 1993) (finding implied waiver in action to enforce arbitration award); *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 189 (D.D.C. 2016) (finding waiver in petition to confirm arbitration award following arbitration in a New York Convention signatory country; "the signatory state must have contemplated enforcement actions in other signatory states."); *M.B.L. Intern. Contractors, Inc. v.*

1    *Republic of Trinidad and Tobago*, 725 F. Supp. 52, 54-55 (D.D.C. 1989) (" . . . this

2    Court rules that the Respondent must have contemplated the participation of the

3    United States courts for enforcement of arbitration awards under the Convention

4    notwithstanding that the Respondent is a foreign state and the Petitioners are foreign

5    corporations."); *Ipitrade Intern., S.A. v. Federal Republic of Nigeria*, 465 F. Supp.

6    824, 826 (D.D.C. 1989) (finding waiver in petition to confirm an arbitration award).

7           Here, of course, Fouad does not seek to enforce an arbitration award. In fact,

8    Fouad has abandoned his two prior attempted arbitrations, so no arbitral award has

9    obviously been rendered. The implied waiver exception plainly does not apply.

10                  **2.      The commercial activity exception does not apply.**

11          Nor does the commercial activity exception apply. It is self-evident that

12   measures taken by a sovereign state to ensure its defensive readiness are not

13   commercial in nature. To the contrary, these activities constitute some of the most

14   essential functions of the modern sovereign state.

15          The commercial activity exception deprives a foreign state of immunity

16   where the action is based upon (1) a commercial activity carried on in the United

17   States by the foreign state; (2) an act performed in the United States in connection

18   with a commercial activity of the foreign state elsewhere (i.e., outside the U.S.); or

19   (3) an act outside the United States that was taken in connection with a commercial

20   activity of the foreign state outside of the U.S. and that caused a direct effect in the

21   United States. 28 U.S.C. § 1605(a)(2). Fouad asserts that all three clauses of the

22   commercial activity exception are satisfied. Compl. ¶¶ 17-22. In fact, none are.

23                  **a.      The Sovereign Defendants did not engage in
                             "commercial activity."**
24

25          "Commercial activity" must, of course, be commercial in nature. The FSIA

26   makes this clear:  "commercial activity" is defined as  "either a regular course of

27   commercial conduct or a particular commercial transaction or act." 28 U.S.C. §

28   1603(d). "The commercial character of an activity shall be determined by reference

1   to the nature of the course of conduct or particular transaction or act, rather than by

2   reference to its purpose." *Id.*

3         "[T]he question is not whether the foreign government is acting with a profit

4         motive or instead with the aim of fulfilling uniquely sovereign objectives.

5         Rather, the issue is whether the particular actions that the foreign state

6         performs (whatever the motive behind them) are the type of actions by which

7         a private party engages in 'trade and traffic or commerce.'"

8   *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (citation omitted).

9

10           **(1)    The services procured under the CSA do not constitute "commercial activity."**

11         Fouad suggests that the mere fact that DSS and the Qatar Armed Forces

12   entered into a contract "for the purchase and sale of goods and services" reflects

13   "commercial activity." Compl. ¶ 19. But relevant authority squarely rejects this

14   simplistic assumption. *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d

15   1543, 1549 (D.C. Cir. 1987).

16         Here, the services Qatar engaged DSS to perform are clearly not "the type of

17   actions by which a private party engages in 'trade and traffic or commerce.'"

18   *Weltover*, 504 U.S. at 614 (citation omitted). Qatar engaged DSS to perform services

19   that were strictly sovereign in nature. The modernization of Qatar's military

20   command and control system is a far cry from developing rural land or purchasing a

21   motor vehicle. The Consultancy Agreement itself recognizes the profoundly

22   sovereign character of the work to be performed: "to maintain the territorial integrity

23   of Qatar and surrounding territorial waters and airspace . . . ." Consultancy

24   Agreement, Compl., Ex. A, Annex A, § A(1), Docket Entry 1-2 (p. 9); Compl. ¶ 34.

25   Moreover, performing its obligations required DSS to closely and seamlessly

26   integrate its efforts with the military "Command Centers" overseen by the Qatar

27   Armed Forces, as well as other sovereign arms of the state, including its various

28   military branches and ministries. Consultancy Agreement, Compl., Ex. A, Annex

A, § A(3.2.1.3.1)(B), Docket Entry 1-2 (pp. 28-30).

Phase One of the project, which Fouad alleges DSS fully performed, Compl. ¶ 45, is described as "preparation of the C4I System RFP phase." *Id.* at Annex A, § A(3.2), Docket Entry 1-2 (p. 11). The objective of the phase was to "determine the 'function and capability required,'" with the "key deliverable" being a "complete and integrated C4I System acquisition RFP document." *Id.* Phase Two, which Fouad alleges DSS performed at least in part, if not completely, Compl. ¶¶ 49-50, 56, comprised selection of the "optimal supplier" to deliver a "turn key solution that provides the required capability." Consultancy Agreement, Compl., Ex. A, Annex A, § A(3.2), Docket Entry 1-2 (p. 12). DSS thus performed functions that Qatar's military would have otherwise performed. DSS personnel were integrated into the Falcon Committee, which was comprised of senior Qatari military and defense personnel, thus supplementing the ranks of Qatar's own military forces and were co-located with them in the same space in Qatar. Consultancy Agreement, Compl., Ex. A, Annex A, § C(1), Docket Entry 1-2 (p. 69); Compl. ¶ 41.

Case authority squarely on point holds that services of this sort are anything but commercial in nature. In *UNC Lear Services, Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210 (5th Cir. 2009), the Kingdom of Saudi Arabia ("Saudi Arabia") entered into a services contract that required the plaintiff to send personnel to Saudi Arabia to provide training and support services to the Royal Saudi Air Force ("Air Force"). *Id.* at 213. The plaintiff's employees were integrated with Air Force personnel, as was the case here, and provided training and support in post-ejection survival, photo reconnaissance, flight operations, tactics and weapons to the Air Force. *Id.* They worked, as here, directly for and under the control of the military. Certain of the plaintiff's employees were responsible for developing and coordinating emergency action procedures for the pilots of the F-5 aircraft, while others provided training to the Air Force in fighter weapons and tactics. *Id.* The court found little difficulty in holding that the services contract did not qualify for

the commercial activity exception:  it is "difficult to imagine an act closer to the core of a nation's sovereignty" than maintaining an air defense system. *Id.* at 217. *See also Butters v. Vance International, Inc.*, 225 F.3d 462 (4th Cir. 2000) (guarding a head of state is a sovereign act and not one a private party could undertake).

The virtual identity of facts here is striking. Here, as in *Lear*, the services procured by the Qatar Armed Forces were central to maintaining and improving Qatar's national defense system. Indeed, they were a critical component of an inherently sovereign act—the maintenance of defensive capacity to repel invaders.

### (2)     Alleged blacklisting by a sovereign nation is not "commercial activity."

In a feeble effort to salvage his claim, Fouad alleges that the Qatar Armed Forces blacklisted DSS after he initiated the [first] of his multiple failed proceedings. No detail whatsoever is provided in support of this baseless assertion. Compl. ¶¶ 51-52, 80, 91. But even if such an allegation were true—and it cannot be taken as such in light of its patently conclusory nature—acts of blacklisting or threats of reprisal by a nation state are not "commercial activity" under the FSIA. *See Intercontinental Indus. Corp. v. Wuhan State Owned Indus. Holdings Co., Ltd.*, 726 Fed. Appx. 619, 620 (9th Cir. 2018) ("a private party does not use political influence and authority to protect another party's investments and resolve disputes in its favor."); *Cicippio v. Islamic Republic of Iran,* 30 F. 3d 164, 168 (D.C. Cir. 1994) (threatening state-sponsored sanctions and reprisals are not the "typical acts of market participants"); *see also Eringer v. Principality of Monaco*, 2011 WL 13134271, at *6 (C.D. Cal. Aug. 23, 2011), *aff'd*, 533 F. App'x 703 (9th Cir. 2013); *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131 (D.D.C. 2008).

### b.     Fouad's action is not "based upon" a commercial activity carried on in the United States.

Fouad must also demonstrate that "commercial activity" has some connection to the United States. He cannot do so. To determine whether the first clause of the

1  commercial activity exception has been met, a court must "'zero[] in on the core' of

2  a suit to determine if the 'particular conduct' at issue is 'based upon' a defendant's

3  acts in the United States." *Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*,

4  No. CV 15-9704-JFW (ASX), 2016 WL 3563504, at *5 (C.D. Cal. Mar. 9, 2016),

5  *aff'd*, 899 F.3d 1081 (9th Cir. 2018) (citing *OBB*, 136 S.Ct. at 396). "[T]he

6  commercial activity carried on in the United States must be substantial to support

7  jurisdiction." *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693

8  F.2d 1094, 1109 (D.C. Cir. 1982) (quotation omitted).

9        Here, the alleged conduct that forms the gravamen of Fouad's claims

10  unquestionably occurred in Qatar. The "object" of the Consultancy Agreement was

11  the provision of consulting services relating to a command and control system in

12  Qatar designed to secure Qatar's borders and airspace. Consultancy Agreement,

13  Compl., Ex. A, Annex A, at § A(1)-(3.2), Docket Entry 1-2 (pp. 9-14). DSS

14  personnel were co-located with high-ranking military personnel from the Qatar

15  Armed Forces in a facility in Qatar, in which DSS personnel were stationed and

16  worked for a period of more than two years. All payments to DSS were required to

17  be made in Qatari Riyals through a "mutually acceptable local Qatari bank."

18  Consultancy Agreement, Compl., Ex. A, Annex B, § 1.3.1, Docket Entry 1-2 (p. 86).

19  Finally, the Consultancy Agreement provided for any disputes to be resolved in an

20  arbitration in London, England, pursuant to Qatari law. Consultancy Agreement,

21  Compl., Ex. A, Art. 56.1, 56.2, Docket Entry 1-1 (p. 56). *See Terenkian v. Republic

22  of Iraq*, 694 F.2d 1122, 1137 (9th Cir. 2012) (commercial activity exception not met

23  where agreement called for arbitration in Baghdad under laws of Iraq).

24        In fact, the only connection to the U.S. alleged by Fouad are two two-week

25  trips to Fullerton, California in May and July 2015 in order to "evaluate Raytheon's

26  C4I solutions." Compl. ¶ 41. These two trips—insignificant when measured against

27  the bulk of DSS's work in Qatar—are plainly not the type of "substantial contact"

28  that is required to satisfy the first clause of the commercial activity exception. To

the contrary, they were merely "'transitory' and 'insubstantial' contacts for purposes of the Act." *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1109 (D.C. Cir. 1982) ("We cannot conclude that these two isolated meetings amounted to more than 'transitory' and 'insubstantial' contact for purposes of the Act . . . especially given their uncertain scope and importance."). *See also Zedan v. Kingdom of Saudi Arabia*, 849 F. 2d 1511, 1513-14 (D.C. Cir. 1988); *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1383 (8th Cir. 1993); *Morgan Equipment Co. v. Novokrivorogsy State Ore Min. and Processing Enterprise*, 57 F. Supp. 2d 863, 872 (N.D. Cal. 1998).

### c.   Fouad's action is not "based upon" a U.S. act in connection with a commercial activity elsewhere.

Nor has Fouad satisfied the second clause of the commercial activity exception, which requires proof of "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2). This clause requires "a material connection . . . between the plaintiff's cause of action and *the act performed in the United States*." *Siderman de Blake*, 965 F.2d at 709 (citations omitted). "[T]he acts (or omissions) encompassed in this [second] category are limited to those which in and of themselves are sufficient to form the basis of a cause of action." FSIA House Report, at 19, reprinted in 1976 U.S.C.C.A.N. 6604, 6618.  No such connection exists here.

In fact, the only connection to the U.S. asserted by Fouad are the two meetings in Fullerton referenced above. But Fouad's claims clearly do not arise from these meetings; rather, they arise from alleged conduct that took place exclusively in Qatar: i.e., the alleged failure of the Qatar Armed Forces to pay amounts allegedly owed, efforts to induce DSS to continue to perform, and subsequent alleged efforts to blacklist DSS from other Qatari contracts.

### d.   Fouad's action is not "based upon" an act outside the U.S. that caused a direct effect in the U.S.

Finally, Fouad has failed to satisfy the third clause of the commercial activity exception, which recognizes an exception to a foreign state's sovereign immunity if the plaintiff's lawsuit is "based 'upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.'" *Terenkian*, 694 F.3d at 1133. "Consideration of this factor requires courts to look to the place where legally significant acts giving rise to the claim occurred in determining the place where a direct effect may be said to be located." *Davoyan v. Republic of Turkey*, 116 F. Supp. 3d 1084, 1097 (C.D. Cal. 2013) (quoting *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir. 1997)) (citations and quotations omitted). "A mere tangential effect in the United States from the defendant's act elsewhere does not constitute a 'direct effect' as contemplated in the third clause of § 1605(a)(2)." *Id.*

It is preposterous to contend that there were "direct effects" in the U.S. as a result of the conduct alleged here. This is all that Fouad can say on the subject: "[Defendants] lock[ed] out a U.S. minority shareholder's interest in, and management of, a foreign company, thereby denying the minority shareholder's share of the company's earnings and dividends, causing a foreseeable interruption of the contractual flow of capital, management personnel, engineering data, machinery, equipment, materials, and packaging between the foreign state and the United States . . . ." Compl. ¶ 20. These alleged "effects" are plainly conclusory and do not satisfy the pleading standard set forth in *Twombly* and *Iqbal*. They are also highly speculative. Whether Fouad would have received any earnings or dividends would obviously depend on a number of factors, such as whether DSS had been profitable during the years in question, what debts DSS may have had during those years, and what its corporate bylaws stated regarding distributions.

Moreover, Fouad's alleged inability to receive earnings and dividends is not the type of "legally significant" act that forms the basis of his claims. *See Adler*, 107 F.3d at 727. Rather, it is *DSS*'s alleged failure to receive payments and opportunities

from the Sovereign Defendants that give rise to them. While some courts have found a "direct effect" in the U.S. based on a sovereign's failure to perform its contractual obligation, each case involved circumstances where the place of performance was the U.S. *See, e.g., Weltover*, 504 U.S. at 619; *Adler*, 107 F.3d at 730 ("Nigeria was obligated to make payment in New York. Nigeria's acts had a direct effect in the United States."). Here, Qatar obviously had no obligation to perform the Consultancy Agreement in the U.S., or even to make payment to DSS there.

### 3.     The arbitration exception does not apply.

Fouad also argues that the Sovereign Defendants are not immune because a foreign state must respond to an action to enforce an arbitration agreement, or to confirm an arbitration award. Compl. ¶ 23; 28 U.S.C. § 1605(a)(6). Fouad seeks neither relief, however. In fact, Fouad has already tried his hand at arbitration—and his two efforts have failed dramatically.

### B.     <u>None of the exceptions apply to the State of Qatar and its ministries, which are unconnected to the underlying dispute.</u>

Fouad has named The State of Qatar and its Ministries of Defense and Economy and Commerce as defendants, but none were parties to the Consultancy Agreement, or to any other agreement with DSS. None are alleged to have engaged in commercial activity, and, in fact, none had any alleged interaction with DSS whatsoever other than the Ministry of Economy and Commerce as the entity responsible for licensing and registering it to do business in Qatar. Compl. ¶ 1. These Defendants have no connection whatsoever to the alleged dispute, nor are they alleged to have any connection.  There is thus no basis to find that any exception applies to their immunity under the FSIA.

### C.     <u>The Court lacks subject matter jurisdiction over this dispute because Fouad lacks standing to bring a derivative claim.</u>

The Court lacks subject matter jurisdiction over this dispute for a second and independent reason: Fouad purports to bring this action as a shareholder derivatively

1    on behalf of DSS, but lacks standing to do so under Qatar law.

2         Both the Articles of Association and the Shareholder Agreement to which

3    Fouad is a party are governed by the laws of Qatar. *See* Articles of Association,

4    Northmore-Ball Decl., Ex. 2, at Art. 42, Docket Entry 30-4; Shareholder Agreement,

5    Northmore-Ball Decl., Ex. 3, at Art. 17, Docket Entry 30-5. Neither the Articles of

6    Association nor the Shareholder Agreement expressly grant Fouad, as a shareholder,

7    the right to bring a derivative suit. Thus, because DSS is incorporated in Qatar and

8    subject to Qatari law, the question of whether such a right exists is a matter of Qatari

9    law. *Batchelder v. Kawamoto*, 147 F.3d 915, 918 (9th Cir. 1998), as amended (July

10   15, 1998) (choice of law provision in deposit agreement required application of

11   Japanese law to question of plaintiff's standing to bring a derivative suit).

12        Qatar's Commercial Companies Law No. 11 of 2015 (the "Companies Law"),

13   which governs the rights of shareholders and members of limited liability companies

14   like DSS, is explicit on the subject: it does not recognize the right of a shareholder

15   to bring a derivative claim. Decl. of Mohammed Al-Ansari ("Al-Ansari Decl.") ¶ 8,

16   Docket Entry 30-16. The Companies Law specifies that the manager of a limited

17   liability company is the sole individual with authority to manage, represent, bind

18   and act on behalf of the company, unless the company's articles of association

19   provide otherwise. *Id.* Here, only the manager of DSS who is registered in the

20   Company's commercial registration certificate can act as the company's legal

21   representative with the authority to bring a claim on its behalf. *Id.* ¶ 10.

22        Fouad does not, and cannot, allege that he is an existing manager of DSS

23   registered in the Company's certificate of registration. Northmore-Ball Decl., Ex. 4,

24   Docket Entry 30-6. He therefore lacks standing to bring proceedings on behalf of

25   DSS, and his claims must be dismissed. *Batchelder*, 147 F.3d at 922 (affirming

26   dismissal of shareholder derivative suit on ground that plaintiff lacked standing to

27   bring derivative claims under Japanese law).

28        **D.**      <u>**Plaintiff cannot establish personal jurisdiction over the Defendants.**</u>

1   The FSIA conditions personal jurisdiction over foreign states on the existence

2   of subject matter jurisdiction plus effective service. *Cassirer v. Kingdom of Spain*,

3   461 F. Supp. 2d 1157, 1166 (C.D. Cal. 2006), *aff'd in part and rev'd in part*, 616

4   F.3d 1019, 1037 (9th Cir. 2010). Because the Court lacks subject matter jurisdiction,

5   the Court also lacks personal jurisdiction over the Sovereign Defendants.

6   **E.     This Court is not a proper forum.**

7   The absence of subject matter and personal jurisdiction are not the only fatal

8   flaws here. This is not a proper forum. The Settlement Agreement specifies that the

9   courts of Qatar shall have "exclusive jurisdiction to decide any claim, dispute, or

10  difference arising from or relating to this agreement." Settlement Agreement,

11  Northmore-Ball Decl., Ex. 1, at § 17, Docket Entry 30-3. This forum clause must be

12  enforced. *Atl. Marine Const. Co.*, 571 U.S. at 61 ("a valid forum-selection clause

13  should be given controlling weight in all but the most exceptional cases").

14  As he has done in the past, Fouad purports to pursue this case on behalf of

15  DSS, notwithstanding the fact that he has no authority to do so. The bizarre rationale

16  articulated by him is that he may do so because the prior DSS board of directors

17  elected to settle the claims of DSS against the Qatar Armed Forces. Compl. ¶ 105.

18  To the extent that this perverse argument merits consideration, it obviously

19  implicates the terms of the Settlement Agreement itself, which specifically identifies

20  as released those claims that Fouad has asserted in this action. Plainly, the forum

21  selection clause in the Settlement Agreement applies to disputes that implicate the

22  terms of this agreement. *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d

23  1081, 1086 (9th Cir. 2018) ("The dispute need not grow out of the contract or

24  require interpretation of the contract in order to relate to the contract.").

25  Even if one were to overlook the Settlement Agreement's forum selection

26  clause for the sake of argument, Fouad would still not be entitled to pursue his

27  claims here. Under the Consultancy Agreement, the parties agreed to arbitrate any

28  dispute in London, England. Consultancy Agreement, Compl., Ex. A, Art. 56.1,

Docket Entry 1-1 (p. 56). Fouad has acknowledged the applicability of this provision by twice submitting this dispute to the ICC in London, even purportedly withdrawing the second proceeding while preserving his right to resubmit it to the ICC in the future. Northmore-Ball Decl., Exs. 5, 11, 12, Docket Entries 30-7, 30-13, 30-14. "By its terms, the [FAA] 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 2017 F.3d 1126, 1130 (9th Cir. 2000) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

Under any circumstances, therefore, it is clear that this Court is not the proper venue for this dispute. Dismissal is thus required. *See Atl. Marine Const. Co.*, 571 U.S. at 60 (dismissal pursuant to forum selection clause authorized through doctrine of forum non conveniens); *ASUS Computer Int'l v. InterDigital, Inc.*, No. 15-CV-01716-BLF, 2015 WL 5186462, at *2 (N.D. Cal. Sept. 4, 2015) (dismissal to enforce an arbitration provision authorized under Rule 12(b)(1)).

**F.     The Complaint fails to state a claim for relief.**

Under the terms of the Settlement Agreement, DSS agreed to accept payment in full satisfaction of moneys owed under the Consultancy Agreement in exchange for a full release of claims. This agreement obviously operates to deprive DSS—and Fouad—of any right to pursue the claims asserted here. Because the Settlement Agreement unambiguously released the Sovereign Defendants from any liability for the claims asserted in this action, the Court must dismiss the claims with prejudice. *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 35 (1st Cir. 2001) (affirming lower court opinion granting motion to dismiss on ground that settlement agreement unambiguously released appellee from liability).

**V.     CONCLUSION**

For the foregoing reasons, the Sovereign Defendants respectfully request that the Court enter an Order dismissing Fouad's Complaint with prejudice.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated:  January 3, 2020

**DLA PIPER LLP (US)**

By: */s/ Amanda C. Fitzsimmons*

KEVIN WALSH
AMANDA C. FITZSIMMONS
MANDY CHAN
COLLEEN MCELROY
Attorneys for Specially Appearing
Defendants
THE STATE OF QATAR; MINISTRY OF
DEFENSE; QATAR ARMED FORCES;
and MINISTRY OF ECONOMY AND
COMMERCE