# EXHIBIT 5



IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE
ICC INTERNATIONAL COURT OF ARBITRATION (2017)

B E T W E E N:

DIGITAL SOULA SYSTEMS

**Claimant**

-and-

QATAR ARMED FORCES

**Respondent**

---

REQUEST FOR ARBITRATION

8 JUNE 2018

---

INTRODUCTION

1. This Request for Arbitration is submitted on behalf of Digital Soula Systems (the "**Claimant**"), pursuant to Article 4 of the Rules of Arbitration of the International Chamber of Commerce in force from 1 March 2017 (the "**ICC Rules**"). It is brought against Qatar Armed Forces, which is the arm of the Qatari Ministry of Defence with responsibility (among other things) for procurement (the "**Respondent**").

2. This Request provides the following information as required by the ICC Rules:
   a. The name, description and address of each of the Parties and their representatives (Section A);
   b. The nature and circumstances giving rise to the dispute (Section B);
   c. The dispute resolution clause, the proposed governing law, the seat and language of the arbitration (Section C);
   d. The Claimant's position concerning the composition of the Tribunal (Section D);
   e. The Claimant's damages (Section E);
   f. A statement of relief being sought (Section F); and
   g. Claimant's payment of arbitration fees (Section G).

3. At the outset, it is noted that the dispute primarily concerns the Respondent's failure to

pay sums due and outstanding to the Claimant pursuant to a contract for the provision of consultancy services, together with losses suffered by the Claimant as a result of the non-payment of these sums and for its detrimental reliance upon false representations made by the Respondent.

4. In addition, significant losses have been suffered by the Claimant as a result of it being blacklisted by the Minister of Defence after it became known that consultants to the Claimant had uncovered cogent evidence indicating a strong likelihood of potential corruption in a number of acquisitions of multi-billion dollar defense systems. A combination of this blacklisting and unpaid invoices has resulted in the Claimant ceasing operations.

5. As noted in Section E (below), the Claimant is only seeking to recover 20% of the losses suffered as a result of the Respondent's actions. This is so that one of the shareholders, Mr Tarek Fouad, can be compensated fully for the losses he has suffered by virtue of his equity stake in the Claimant. No monies are being sought in relation to the remaining shareholders, nor will any of these shareholders receive any proceeds from any Award in the Claimant's favour. This is as a result of direct threats made to a Qatari-based shareholder and Chairman of the Claimant, which has been intended to prevent any legal action being taken. These threats, which would have serious consequences to local shareholders and their business interests in Qatar, have also diminished their ability to make decisions and/or act in the best interests of the Claimant. Accordingly, the local shareholders have elected not to play any active role in the arbitration and have waived their rights to benefit from any recovery in this Arbitration.

A. **THE PARTIES**

*The Claimant*

6. The Claimant is Digital Soula Systems, is a Qatar-based defence and security consultancy firm. The Claimant's registered address is as follows:

   *DSS*
   *PO Box 17693*
   *Doha*
   *Qatar*

   *Attn: Tarek Fouad*

7. Claimant's counsel, to whom all correspondence should be set in this Arbitration is as follows:

EXHIBIT 5, PAGE 59

*Cooley (UK) LLP*
*Dashwood*
*69, Old Broad Street*
*London*
*EC2M 1QS*
*United Kingdom*

*Attn:* **Mark Deem**, *Partner*

*Telephone:  +44 (0) 20 7556 4425*
*Facsimile:  +44 (0) 20 7374 0998*

***The Respondent***

8. The Respondent is the Qatar Armed Forces, which is the arm of the Qatari Ministry of Defence with responsibility for procurement. The Respondent's registered office is as follows:

    *General Head Quarters (GHQ)*
    *Qatar Armed Forces*
    *PO Box 37*
    *Doha*
    *Qatar*

    *Tel. +974 4461 4111*

    *Attn:   Dr. Khalid bin Mohammad Al Attiyah,*
    *Minister of State for Defence Affairs*

9. It is not known whether the Respondent has appointed separate legal counsel in relation to the dispute at the time of filing this Request.

**B.   BRIEF BACKGROUND TO THE DISPUTE**

10. The dispute arises pursuant to a Consultancy Services Agreement (Tender No. TAC/PD/DC/S/88/2013-2014) (the **"Agreement"**) between the Parties in relation to the acquisition of a C4I system (a command, control, communications, computers and intelligence system) for Joint Operations Command, which was referred to by the Parties as the Falcon Project (the **"Project"**).

11. The Respondent awarded the Agreement to the Claimant in or around June 2014, following a tender process commenced by the Respondent in 2013. Terms and Conditions were signed by the Parties in January 2015 and the delivery of services under the Agreement commenced shortly thereafter, in or around March 2015. A copy

of the Agreement, including terms and conditions, is appended to this Request as Annex A.

12. Pursuant to the terms of the Agreement, the Claimant agreed to supply the defined Scope of Services and Deliverables to the Respondent in accordance with terms of the Agreement. It was an express term of the Agreement that DSS shall perform the Services as specified in the Scope of Work (*see Article 3.2*).

13. The Scope of Work, which is attached to the Terms and Conditions as Appendix A provides for the Project to be run as turnkey project, with eight milestones. Although the Agreement has a term of twelve months, nothing in the Agreement provides any basis for the Agreement terminating at the end of this twelve month period, nor is there a contractual requirement for the Services and Deliverables to be completed within this timeframe.

14. Indeed, the Scope of Work clearly indicates that the aim of the Agreement is for the acquisition of the JOC C4I System and accordingly the milestones are described against only an *"anticipated delivery timeframe"* of twelve months.

15. Two rights of termination exist under the Agreement: termination for convenience and termination for default. These rights are only capable of being exercised by the Respondent. The Claimant had no contractual rights of termination.

16. No termination right has been exercised by the Respondent (whether in line with the Agreement or at all) and, in circumstances where the Claimant was unable to avail itself of any such termination right, it had no other option than to continue to perform its obligations under the Agreement, which included maintaining consultants hypothecated to the Project.

17. Notwithstanding some initial expansion of scope of the Project, milestones 1 to 5 (which comprise Phase One of the Project) were all performed and delivered by the Claimant in accordance with the terms of the Agreement and within the twenty-six week timeframe anticipated. No performance were raised and invoices were issued by the Claimant and duly settled by the Respondent. Equally, milestone 6 was duly performed, invoices raised and subsequently settled.

18. Accordingly, nothing concerning milestones 1 to 6 form part of the dispute between the Parties.

19. Thereafter, however, significant delays occurred to the Project, either at the specific

request of Respondent or as a direct result of its actions or omissions. The Respondent has accepted responsibility for these delays.

20. As a direct result of the delays, the Claimant was assured on 24 October 2016 (some 18 months after the start of the Project) that if it continued to support the Project, maintaining its operations and performing tasks assigned to it, then (i) second and subsequent phases of the Project would take place in due course; (ii) the Claimant would be entitled to complete its work under the Project; and (iii) the Claimant would receive payment in full for the outstanding milestones and for the delays which had occurred.

21. In strict reliance upon these representations, the Claimant continued to support the Project and to perform those tasks assigned to it. Invoices in respect of this work were duly raised by the Claimant and have not been paid, whether within the 45-day payment timeframe or at all.

22. Further, the Claimant understands that, as a result of (i) the Claimant seeking payment of invoices (to which it is properly entitled) through raising a formal dispute; and, as noted above (ii) certain information likely to be indicative of corruption identified by consultants to the Claimant in the behavior of the Respondent, the Claimant has been blacklisted by the Respondent and will not be entitled to bid for or secure further work in Qatar.

23. As a result of the non-payment of the invoices (as well as the blacklisting of the Claimant by the Minister of Defence, as noted above), the Claimant has been forced to wind-down its operations in Qatar and is no longer trading.

## C.   DISPUTE RESOLUTION CLAUSE

24. The relevant dispute resolution clauses of the Agreement are provided at Articles 53 and 56:

    *Article 53   Language of the Contract*

    53.1 *The text of this Contract is to be in English, except for the executive summary, which shall be in Arabic and English. In the event of any dispute arising from an alleged difference in meaning between the Arabic and the English text of this Contract, the English text shall prevail.*

    53.2 *All contractual correspondence shall be in English. All CONSULTANT produced documentation, shall be in English language unless otherwise specified in the Scope of Work.*

    53.3 *All documentation provided to the CONSULTANT by the CLIENT will be in*

*the language in which it is available to the CLIENT, without translation.*

...

EXHIBIT 5, PAGE 63

*Article 56    Governing Law and Disputes*

*56.1    Both parties have entered this agreement based on good will and good faith. However, should any dispute arise between the parties, such disputes shall first be attempted settled by amicable negotiations. If an agreement is not reached within thirty (30) Days, after the start of negotiations, dispute shall be settled by arbitration under the rules of the International Chamber of Commerce. Both parties shall appoint one or more arbitrators in accordance with the said rules. The arbitration shall take place in London, England or any other venue the parties may agree on. The result of the arbitration shall be final, binding and enforceable on the parties, and be in lieu of any other remedy.*

*56.2    The governing law shall be the laws of the State of Qatar.*

*56.3    The CONSULTANT is not, because of such a dispute, entitled to stop the Work or any part thereof, including the subject matter of this dispute, and he shall accomplish the Work as per the CLIENT's instructions until the dispute is solved, or a final decision is issued by the arbitration body.*

25. For completeness, the Parties have sought to settle the dispute by amicable negotiations. A formal notice of dispute was provided on 9 June 2017 and meetings have been arranged and taken place periodically since then, in an attempt to try to resolve matters. The last meeting between the Parties was on 4 April 2018.

26. Accordingly, the Claimant's position is that the Arbitration shall be conducted under the ICC Rules and that the governing law of the Agreement will be the law of Qatar. The Arbitration shall have London as its seat and shall be conducted in English.

### D.    THE TRIBUNAL

27. On a proper interpretation of Article 56 of the Agreement and Article 12 of the ICC Rules, the Claimant's position is that the tribunal should be comprised of three arbitrators, with each of the Claimant and Respondent being entitled to nominate one arbitrator and that those two nominated arbitrators shall appoint a third arbitrator to serve as Chair of the Tribunal.

28. On this basis, the Claimant nominates Mr Stewart Boyd CBE QC of Essex Court Chambers, 24 Lincoln's Inn Fields London WC2A 3EG United Kingdom for confirmation as the Claimant's Co-Arbitrator. To the best of the Claimant's knowledge, Mr Boyd is independent of the Parties in this Arbitration. To the extent that this is not the case, the Claimant reserves the right to nominate a replacement arbitrator.

### E. CLAIMANT'S DAMAGES

29. The Claimant's damages fall into three categories: (i) unpaid invoices; (ii) damages in respect of the diminution in value of the Claimant as a result of not been awarded promised work and being blacklisted in Qatar; and (iii) interest on a simple basis on the amounts claimed.

30. A summary of the unpaid invoices claim in the sum of QAR 33,673,832 (approximately US$ 9,245,992 using the prevailing exchange rate at the date of filing this Request) is appended to this Request as Annex B. The Claimant presented estimates the diminution in value of the Claimant to be in the range of approximately US$ 25 million to $50 million. This will necessarily be a matter on which expert evidence may be required. Accordingly, the total amount of damages suffered by the Claimant is in the range of US$34 million to $59 million plus interest at an annual rate of 5%

31. As previously noted, however, the Claimant is only seeking 20% of its full losses as a result of only one shareholder seeking any compensation for his shareholding. As a result the Claimant is seeking a maximum of US$ 11,849,198 plus interest at an annual rate of 5%.

### F. RELIEF SOUGHT

32. As a result, the Claimant respectfully requests the Arbitral Tribunal to issue an award:
    a. Declaring that the Arbitral Tribunal has jurisdiction to consider the dispute between the Parties as outlined in this Request;
    b. Declaring that the Respondent breached its obligations under the Agreement to make payment in respect of invoiced amounts and/or caused the Claimant losses by making false representations, which were relied upon by the Claimant to its detriment by continuing to work on the Project;
    c. Ordering the Respondent to pay the Claimant 20% of its outstanding invoiced amount, currently estimated to be in the amount of US$ 1,849,198.
    d. Ordering the Respondent to pay the Claimant 20% of its damages and losses suffered as a result of the Respondent's breach of Agreement and/or misrepresentations, currently estimated to be in the range of US$ 5,000,000 to US$ 10,000,000.
    e. Ordering the Respondent to pay all the arbitration costs, including costs and disbursements of Claimant's counsel; and
    f. Ordering the Respondent to pay interest at an annual rate of 5% on the amounts set out above from the date they fell due to until the date of their effective payment.

EXHIBIT 5, PAGE 65

33. For the avoidance of any doubt, the Claimant reserves its right to:
   a. raise any and all further claims arising out of or in connection with the disputed matters described in this Request or otherwise arising between the Parties; and
   b. amend and/or supplement the relief sought herein;
   c. produce such factual or legal arguments or evidence (including witness evidence, expert evidence and other documents) as may be necessary to present its case or rebut any case which may be put forward by Respondent; and
   d. seek interim and provisional measures before this Arbitral Tribunal or any competent national court.

G. **PAYMENT OF FEES**

34. Pursuant to Appendix III, Article 1(1) of the ICC Rules, the Claimant is making an advance payment of $5,000 by way of bank transfer at the same time as sending this Request, with reference "Digital Soula Systems". The Claimant acknowledges that such payment is non-refundable and shall be credited to its portion of the advance on costs in due course.

**Mark Deem**

**Cooley (UK) LLP**

**8 June 2018**