# EXHIBIT 11

IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE
ICC INTERNATIONAL COURT OF ARBITRATION (2017)

B E T W E E N:

### DIGITAL SOULA SYSTEMS

Claimant

-and-

### QATAR ARMED FORCES

Respondent

_____

### REQUEST FOR ARBITRATION

### 20 FEBRUARY 2019

_____

## INTRODUCTION

1.   This Request for Arbitration is submitted on behalf of Digital Soula Systems (the "**Claimant**"), pursuant to Article 4 of the Rules of Arbitration of the International Chamber of Commerce in force from 1 March 2017 (the "**ICC Rules**").  It is brought against Qatar Armed Forces, which is the arm of the Qatari Ministry of Defence with responsibility (among other things) for procurement (the "**Respondent**").

2.   This Request provides the following information as required by the ICC Rules:
     a.   The name, description and address of each of the Parties  and their representatives (Section A);
     b.   The nature and circumstances giving rise to the dispute (Section B);
     c.   The dispute resolution clause, the proposed governing law, the seat and language of the arbitration (Section C);
     d.   The Claimant's position concerning the composition of the Tribunal (Section D);
     e.   The Claimant's damages (Section E);
     f.   A statement of relief being sought (Section F); and
     g.   Claimant's payment of arbitration fees (Section G).

5023561 v1
EXHIBIT 11, PAGE 92

3.     At the outset, it is noted that the dispute primarily concerns the Respondent's failure to pay sums due and outstanding to the Claimant pursuant to a contract for the provision of consultancy services, together with losses suffered by the Claimant as a result of the non-payment of these sums and for its detrimental reliance upon false representations made by the Respondent.

4.     In addition, significant losses have been suffered by the Claimant as a result of it being blacklisted by the Minister of Defence after it became known that consultants to the Claimant had uncovered cogent evidence indicating a strong likelihood of potential corruption in a number of acquisitions of multi-billion dollar defense systems. A combination of this blacklisting and unpaid invoices has resulted in the Claimant ceasing operations.

5.     An earlier arbitration concerning these claims was brought by the Claimant on 8 June 2018 and given the ICC Case number 23698. That case, which had been formulated in a manner designed to protect certain shareholders (including a Qatari-based shareholder and Chairman of the Claimant), who had been threaten with certain personal consequences should the matter proceed, was ultimately withdrawn following an application under Article 37(6) of the Rules. Whilst the Claimant believes that such threats (which have diminished the ability of those shareholders and directors to make decisions and/or act in the best interests of the Claimant) remain extant, there is no longer any need to offer protection to these individuals in relation to the relief sought. Accordingly, it is being re-introduced in a slightly re-formulated manner.

5023561 v1          EXHIBIT 11, PAGE 93

## A.    THE PARTIES

### *The Claimant*

6.     The Claimant is Digital Soula Systems, is a Qatar-based defence and security consultancy firm. The Claimant's registered address is as follows:

> *DSS*
> *PO Box 17693*
> *Doha*
> *Qatar*
>
> *Attn: Tarek Fouad*

7.     Claimant's counsel, to whom all correspondence should be set in this Arbitration is as follows:

> *Cooley (UK) LLP*
> *Dashwood*
> *69, Old Broad Street*
> *London*
> *EC2M 1QS*
> *United Kingdom*
>
> *Attn:* **Mark Deem**, *Partner*
>
> | | |
> |---|---|
> | *Telephone:* | *+44 (0) 20 7556 4425* |
> | *Facsimile:* | *+44 (0) 20 7374 0998* |

### *The Respondent*

8.     The Respondent is the Qatar Armed Forces, which is the arm of the Qatari Ministry of Defence with responsibility for procurement.  The Respondent's registered office is as follows:

> *General Head Quarters (GHQ)*
> *Qatar Armed Forces*
> *PO Box 37*
> *Doha*
> *Qatar*
>
> *Tel. +974 4461 4111*
>
> *Attn:    Dr. Khalid bin Mohammad Al Attiyah,*
> *Minister of State for Defence Affairs*

9.     Respondent's counsel, to whom all correspondence should be set in this Arbitration is as

5023561 v1

EXHIBIT 11, PAGE 94

follows:

*Carter Ruck*
*6 St Andrew Street*
*London*
*EC4A 3AE*
*United Kingdom*

*Attn: **Cameron Doley**, Partner*

*Telephone:     +44 (0) 20 7353 5005*
*Facsimile:      +44 (0) 20 7353 5553*

## B.     BRIEF BACKGROUND TO THE DISPUTE

10.     The dispute arises pursuant to a Consultancy Services Agreement (Tender No. TAC/PD/DC/S/88/2013-2014) (the "**Agreement**") between the Parties in relation to the acquisition of a C4I system (a command, control, communications, computers and intelligence system) for Joint Operations Command, which was referred to by the Parties as the Falcon Project (the "**Project**").

11.     The Respondent awarded the Agreement to the Claimant in or around June 2014, following a tender process commenced by the Respondent in 2013.   Terms and Conditions were signed by the Parties in January 2015 and the delivery of services under the Agreement commenced shortly thereafter, in or around March 2015.  A copy of the Agreement, including terms and conditions, is appended to this Request as Annex A.

12.     Pursuant to the terms of the Agreement, the Claimant agreed to supply the defined Scope of Services and Deliverables to the Respondent in accordance with terms of the Agreement.  It was an express term of the Agreement that DSS shall perform the Services as specified in the Scope of Work (*see Article 3.2*).

13.     The Scope of Work, which is attached to the Terms and Conditions as Appendix A provides for the Project to be run as turnkey project, with eight milestones.  Although the Agreement has a term of twelve months, nothing in the Agreement provides any basis for the Agreement terminating at the end of this twelve month period, nor is there a contractual requirement for the Services and Deliverables to be completed within this timeframe.

14.     Indeed, the Scope of Work clearly indicates that the aim of the Agreement is for the acquisition of the JOC C4I System and accordingly the milestones are described against only an *"anticipated delivery timeframe"* of twelve months.

5023561 v1                              EXHIBIT 11, PAGE 95

15.    Two rights of termination exist under the Agreement: termination for convenience and termination for default.   These rights are only capable of being exercised by the Respondent.  The Claimant had no contractual rights of termination.

16.    No termination right has been exercised by the Respondent (whether in line with the Agreement or at all) and, in circumstances where the Claimant was unable to avail itself of any such termination right, it had no other option than to continue to perform its obligations under the Agreement, which included maintaining consultants hypothecated to the Project.

17.    Notwithstanding some initial expansion of scope of the Project, milestones 1 to 5 (which comprise Phase One of the Project) were all performed and delivered by the Claimant in accordance with the terms of the Agreement and within the twenty-six week timeframe anticipated.  No performance were raised and invoices were issued by the Claimant and duly settled by the Respondent. Equally, milestone 6 was duly performed, invoices raised and subsequently settled.

18.    Accordingly, nothing concerning milestones 1 to 6 form part of the dispute between the Parties.

19.    Thereafter, however, significant delays occurred to the Project, either at the specific request of Respondent or as a direct result of its actions or omissions.

20.    These delays were caused by a number of different factors, including:

   a. **Delays caused by the Qatari Minister of Defense** – specifically by repeatedly changing the Project Director, the individual responsible for the delivery of the overall project for the Respondent. In this regard, the Project Director was changed from Brigadier General Hassan Al Ali to Brigadier General Abdul Aziz Al Dossari; then changed back to Brigadier General Hassan Al Ali; and then to Brigadier General Mohammed Abdul Latif Al Mannai.  Each change caused considerable delays as a result of the new Project Director wanting to learn about the Project and then making changes to the scope of the Project.

   b. **Delays caused by the Emiri Diwan** – following the sharp decline in oil prices in 2016, the Qatari Government considered the ways in which expenses to all non-World Cup 2022 projects could be cut.  In particular, the Emiri Diwan commenced a project review process which resulted in significant delays.

5023561 v1
EXHIBIT 11, PAGE 96

c.  **Delays caused by the Respondent's Tender Committee** – in response to requests for further time from third party international defense companies, the Respondent granted extensions to proposed deadlines for further tenders, which impacted the Project.

21.  The Respondent has confirmed the Claimant delivered all milestones on time and has accepted responsibility for these delays.

22.  In particular, the Respondent admitted responsibility for the delays in a letter from Brigadier General Al Mannai, copied to the Qatari Minister for Defense and the Respondent's Project leadership assured the Claimant (and its consultants – comprising retired military personnel from the United Kingdom, Germany, Pakistan/Canada) on several occasions that it would be paid for the Project delays.

23.  As a direct result of the delays, the Claimant was assured in several meetings including on 24 October 2016 (some 19 months after the start of the Project) that if it continued to support the Project, maintaining its operations and performing tasks assigned to it, then (i) second and subsequent phases of the Project would take place in due course; (ii) the Claimant would be entitled to complete its work under the Project; and (iii) the Claimant would receive payment in full for the outstanding milestones and for the delays which had occurred.

24.  In strict reliance upon these representations, the Claimant continued to support the Project and to perform those tasks assigned to it. Invoices in respect of this work were duly raised by the Claimant and have not been paid, whether within the 45-day payment timeframe or at all.

25.  Further, the Claimant understands that, as a result of (i) the Claimant seeking payment of invoices (to which it is properly entitled) through raising a formal dispute; and, as noted above (ii) certain information likely to be indicative of corruption identified by consultants to the Claimant in the behavior of the Respondent, the Claimant has been blacklisted by the Respondent and will not be entitled to bid for or secure further work in Qatar.

26.  As a result of the non-payment of the invoices (as well as the blacklisting of the Claimant by the Minister of Defence, as noted above), the Claimant has been forced to wind-down its operations in Qatar and is no longer trading.

**C.      DISPUTE RESOLUTION CLAUSE**

27.     The relevant dispute resolution clauses of the Agreement are provided at Articles 53 and 56:

> *Article 53        Language of the Contract*
>
> 53.1     *The text of this Contract is to be in English, except for the executive summary, which shall be in Arabic and English. In the event of any dispute arising from an alleged difference in meaning between the Arabic and the English text of this Contract, the English text shall prevail.*
>
> 53.2     *All contractual correspondence shall be in English. All CONSULTANT produced documentation, shall be in English language unless otherwise specified in the Scope of Work.*
>
> 53.3     *All documentation provided to the CONSULTANT by the CLIENT will be in the language in which it is available to the CLIENT, without translation.*
>
> ...
>
> *Article 56        Governing Law and Disputes*
>
> 56.1     *Both parties have entered this agreement based on good will and good faith. However, should any dispute arise between the parties, such disputes shall first be attempted settled by amicable negotiations. If an agreement is not reached within thirty (30) Days, after the start of negotiations, dispute shall be settled by arbitration under the rules of the International Chamber of Commerce. Both parties shall appoint one or more arbitrators in accordance with the said rules. The arbitration shall take place in London, England or any other venue the parties may agree on. The result of the arbitration shall be final, binding and enforceable on the parties, and be in lieu of any other remedy.*
>
> 56.2     *The governing law shall be the laws of the State of Qatar.*
>
> 56.3     *The CONSULTANT is not, because of such a dispute, entitled to stop the Work or any part thereof, including the subject matter of this dispute, and he shall accomplish the Work as per the CLIENT's instructions until the dispute is solved, or a final decision is issued by the arbitration body.*

28.     For completeness, the Parties have sought to settle the dispute by amicable negotiations. A formal notice of dispute was provided on 9 June 2017 and meetings have been arranged and taken place periodically since then, in an attempt to try to resolve matters. The last meeting between the Parties was on 4 April 2018.

29.     It is understood that the Respondent will also seek to allege that the dispute has been settled. This has not been verified and, despite frequent requests, no formal settlement agreement has been produced. Rather, the Claimant fears that any alleged settlement is little more than a further example of intimidatory behavior and misinformation which

5023561 v1

EXHIBIT 11, PAGE 98

has characterized the behavior of the Respondent towards certain shareholders and directors of the Claimant.

30. Such intimidatory behavior – evidence of which will be adduced in due course - includes the Qatari Minister of Defense threatening to refer the Chairman of the Claimant to the Emir of Qatar should the Claimant proceed with this Arbitration (a threat which carries huge consequences for the Directors' other businesses in Qatar). This unwelcome, intimidatory conduct, designed to gag a party with a legitimate dispute from having it resolved in a legitimate manner.

31. Accordingly, the Claimant's position is that the Arbitration should now proceed and shall be conducted under the ICC Rules **on an expedited basis** and that the governing law of the Agreement will be the law of Qatar. The Arbitration shall have London as its seat and shall be conducted in English.

## D. THE TRIBUNAL

32. Article 56 of the Agreement provides that, *"both parties shall appoint one or more arbitrators in accordance with the said rules"*. This could give rise to either a tribunal of one arbitrator appointed by both parties; or a tribunal of three arbitrators. Given the matter is essentially a claim for sums owing under a commercial contract, the Claimant believes that a tribunal of one arbitrator is entirely appropriate.

## E. CLAIMANT'S DAMAGES

33. The Claimant's damages fall into two categories: (i) unpaid invoices; and (ii) interest on a simple basis on the amounts claimed.

34. The Claimant understands that the Respondent has made a partial payment of approximately QAR 9.1 million towards bank interest and a number of outstanding invoices. Although proof of this payment is required, this arbitration seeks the balance of remaining outstanding invoices in the sum of QAR 16,087,456 (approximately US$4,419,626 using the prevailing exchange rate at the date of filing this Request) as set out in Annex B.

## F. RELIEF SOUGHT

35. As a result, the Claimant respectfully requests the Arbitral Tribunal to issue an award:
    a. Declaring that the Arbitral Tribunal has jurisdiction to consider the dispute between the Parties as outlined in this Request;

5023561 v1

b.  Declaring that the Respondent breached its obligations under the Agreement to make payment in respect of invoiced amounts and/or caused the Claimant losses by making false representations, which were relied upon by the Claimant to its detriment by continuing to work on the Project;

c.  Ordering the Respondent to pay the Claimant the outstanding invoiced amounts, together with proof of payment of sums previously discharged;

d.  Ordering the Respondent to pay all the arbitration costs, including costs and disbursements of Claimant's counsel; and

e.  Ordering the Respondent to pay interest at an annual rate of 5% on the amounts set out above from the date they fell due to until the date of their effective payment.

36.  For the avoidance of any doubt, the Claimant reserves its right to:

a.  raise any and all further claims arising out of or in connection with the disputed matters described in this Request or otherwise arising between the Parties; and

b.  amend and/or supplement the relief sought herein;

c.  produce such factual or legal arguments or evidence (including witness evidence, expert evidence and other documents) as may be necessary to present its case or rebut any case which may be put forward by Respondent; and

d.  seek interim and provisional measures before this Arbitral Tribunal or any competent national court.

## G.  PAYMENT OF FEES

37.  Pursuant to Appendix III, Article 1(1) of the ICC Rules, the Claimant is making an advance payment of $5,000 by way of bank transfer at the same time as sending this Request, with reference "Digital Soula Systems". The Claimant acknowledges that such payment is non-refundable and shall be credited to its portion of the advance on costs in due course.

**Mark Deem**

**Cooley (UK) LLP**

**20 February 2019**

5023561 v1

EXHIBIT 11, PAGE 100