Patrick D. Webb, SBN 82857
**WEBB & CAREY**
402 West Broadway, Ste 1230
San Diego CA 92101
619-236-1650
619-236-1283

Attorneys For: Plaintiffs

# IN THE UNTIED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAREK FOUAD, on behalf of DIGITAL SOULA SYSTEMS, <br><br>Plaintiff, <br><br>vs. <br><br>THE STATE OF QATAR, by and through its, QATAR ARMED FORCES, and DOES 1-30, <br><br>Defendants. | Case No. 19-cv-1837 RBK ADS <br><br>**DECLARATION OF TAREK FOUAD IN OPPOSITION TO MOTIONS TO DISMISS AND IN SUPPORT OF MOTION TO STAY ACTION AND COMPEL ARBITRATION** <br><br>Date: March 2, 2020 <br>Time: 9:00 a.m. <br>Crtrm: 850 <br>Judge: Hon. R. Gary Klausner |

I, Tarek Fouad, declare and state as follows:

I have personal knowledge of the facts stated herein and, if called to testify as a witness, would and could testify competently thereto.

**Digital Soula Systems Has Lost Profits of More than $4.4 million as a result of QAF's breach of the Consultancy Services Agreement.**

1. Lt. Col. Al-Mannai and Mr. Abu-Issa dogged determination to give away $4.4 million that Digital Soula Systems ("DSS") earned by all means necessary, including their fraudulent misrepresentations to this court, is worthy of a deeper look, because no human being under normal circumstance and conditions would willingly give away $4.4 million of the company profit which the company legitimately earned, for no lawful consideration. This is confirmed in the three independent witnesses declarations, Lt. Col (Ret.) Pelz, Col (Ret.) James Hall and

1. Lt. Col (Ret.) Hussain Khan, who worked on the QAF project, and have no interest in the outcome of this dispute. As set forth in detail in the verified First Amended Complaint ("FAC") this determination to walk away from $4.4 million has clearly been motivated by Lt. Col. Al-Mannai and Mr. Abu-Issa's attempts to avoid prosecution for facilitating Raytheon's bribes of Sheik Joann bin Hamad Al-Thani, which have been confirmed by independent forensic analysis, evidence of money laundering and evidence of several misrepresentations to this court, which will be outlined here.

2. As set out in the First Amended Complaint ("FAC"), Digital Soula Systems ("DSS") has lost profits of more than $4.4 million as a result of QAF's breach of the Consultancy Services Agreement. DSS was founded in 2013. I am a 20% shareholder and the Manager/Director in Charge of DSS, per Articles 7, 8 and 9 of the DSS Articles of Association, ECF 39-4:1129-30, and CCL Article 243, as reflected in Exhibit 1 attached hereto. Contrary to Mr. Nammour's erroneous claims, DSS has a Board of Directors consisting of Tarek Fouad (20% shareholder), Lt. Col. Al Mannai representing Al Sedriah (60% shareholder), Mr. AbuIssa representing (Salam International 20%). the shareholder Managers, of which I was appointed Manager in Charge, ECF 39-4:1130, and 39-5:1149, ¶5.1; Deem Ex. A-3 and 4, as reflected in DSS Municipal license and DSS Commercial Registration attached in Exhibit 1.

3. DSS had minimum debt of QAR 800,000 (US $219,780) which was confirmed by Lt. Col. Al Mannai's February 3, 2020 declaration in the purported general assembly meeting, on September 26, 2019 "The partners commit to settle their respective share in the company's debt for the benefit of Al – Sedriah Holding in the amount of 400,000 Qatari Riyals (four hundred thousand Riyals). The partners commit to settle their respective share in the company's debt for the benefit of Afuq Qatar in the amount of 400,000 Qatari Riyals (four hundred thousand Riyals)". ECF 40-22:1383.

4.Based on Lt. Col. Al-Mannai's declaration, DSS generated at least $4.2 million in profit, in excess of its private debts of $219,780 (QAR 800,000) conceded in ECF 40-22:1382-3.

**Lt. Col. Al Mannai and Mr. Abu-Issa's Continuing Personal Conflicts of Interest with the Best Interests of DSS Must be Arbitrated as Agreed by QAF**

5.Contrary to QAF's false assertion, all 3 shareholders of DSS agreed to retain Cooley (UK) LLP to initiate arbitration of the QAF's failure to pay for DSS' Consultancy Services, which is confirmed by Hussain Khan's declaration and attached to Mark Deem's declaration as Ex. A-1. When we initiated the arbitration QAF owed DSS QAR 33,673,832 (U.S. $ 9,245,992). QAF had no defense for their failure to pay this amount. DSS had completed the work contracted and QAF had accepted the work without complaint.

6.There is no legitimate reason for the two tainted DSS shareholders, Lt. Col. Al-Mannai and Mr. Abu-Issa to have failed to enforce QAF's obligations to pay the remaining $4.4 million due under the Consultancy Services Agreement. Instead, they illegitimately seek to further obstruct the arbitration of this dispute to which QAF has agreed in Art. 56.1 of the Consultancy Services Agreement, in order to obey the orders of the QAF for whom they have their own personal obligations, and in order to avoid prosecution for facilitating bribes from Raytheon, one of the largest U.S. defense companies in the United States in the amount of QAR 7,006,750 (US $1,924,931) for the benefit of Sheik Joann bin Hamad Al-Thani, brother of the Emir, the head of state of Qatar. Both of these personal benefits are in direct conflict with the best interests of DSS in collecting what is due on the contract.

7.It must be remembered that all three shareholders had agreed, and had paid Cooley (UK) LLP, on behalf of DSS, to initiate the arbitration with QAF, pursuant to Art. 56.1 under the Rules of the International Chamber of Commerce, as reflected in Exhibit 2.

**A.      Personal Obligations to QAF**

8.      As set forth in the FAC, ¶5, ECF 36: at all relevant times herein, I have been the Manager in charge of DSS, most recently due to the fact that the other two managers [directors] of DSS, could not act for the best interests of DSS, in that Lt. Col. Al-Mannai was an active duty officer in the QAF, who was personally obligated to his command in the QAF, and in that Mr. Abu-Issa was the Chief Executive Officer of Salaam International which had substantial other conflicting business with Qatar and the QAF, both of whom and were ordered by QAF to act in the best interests of QAF against the best interests of DSS, as set forth in Deem and Kahn's declarations. Deem Ex. A-1.

**B.      Avoidance of Prosecution for Facilitating Bribes**

9.      As also set forth in the verified FAC,  19-28 ECF 36:7-11, 36:9, Raytheon entered into two sham contracts with DSS, in the amount of QAR 7,006,750 (US $1,924,931) in order to funnel what I learned later to be bribe payments to Sheik Joaan bin Hamad Al Thani, the brother of the Emir of Qatar, the head of state of Qatar. None of the deliverables called for in either contract were created by any of our companies directly or indirectly by subcontractor. Instead, Raytheon created the defense studies, and then laundered its payment of the $1,924,931 through Lt. Col., Al-Mannai and Mr. Abu-Issa, who then laundered the bribes through a sham contract with a small local construction company.

10.     The first sham contract was dated February 12, 2014, was for QAR 3,539,250 (US $975,000) for the production of three defense studies for the benefit of QAF.  Instead of the purportedly selling company producing the defense studies, the U.S. defense contractor created 100% of the deliverables and then transferred payment of the full value of the sham contract to the Soula Systems bank account, as reflected in Exhibit 3.  This form of bribe is often referred to as a no work contract.

11.     Under the terms of the purchase order, the purportedly selling

company DSS was supposed to produce the following items and receive the corresponding payments:

- Milestone 1 due March 2014: Start Up Status Report. Amount: $243,750.
- Milestone 2 due April 2014: First Report (Study). Amount $292,500.
- Milestone 3 due May 2014: Second Report (Study). Amount: $243,750.
- Milestone 4 due July 2014: Third Report (Study). Amount $195,000.

12. A "Forensic Examination Report" prepared by Secure Network, attached hereto as Exhibit 4, shows that Raytheon created the deliverables for the four milestones, two well before there was any purported purchase order as follows:

1) The First Milestone: the "Studies Outlines". This document was created by Raytheon on January 27, 2014 **more than two weeks before the purchase order was issued by Raytheon**;

2) The Second Milestone: "Air Force Role in Operations Other Than War (OOTW)" ) - 99 page report was created by Raytheon November 8, 2013. **More than three months before the purchase order was issued by Raytheon;**

3) The Third Milestone: "Combined Air Operation Center (CAOC)" - 95 page report was created by Raytheon on February 18, 2014. **Six days after the purchase order was issued by Raytheon;**

4) The Fourth Milestone: "Challenges Facing Air Operation Centers For The Period 2020-2040"- (Future of C4ISystems) 115 page report was produced and the PDF created by Raytheon on April 14, 2014, two months after the purchase order was issued by the Raytheon.

13. Raytheon did not need to enter into any contract with our company or pay for the deliverables that Raytheon had already created.

14. It was well known to Raytheon that the majority shareholder of all our companies, Al Sedriah is owned by Sheik Joaan Bin Hamad Al Thani, the brother of the Emir of Qatar, as reflected in Exhibit 5. In fact, Sheik Joaan bin

1  Hamad Al Thani owned 83% and his business partners, Lt. Col Al Mannai owned
2  17% of Al Sedriah, as also reflected in Exhibit 5 attached hereto.
3       15.    Upon learning of the illegal nature of these transactions and that the
4  money was intended for Sheik Joann Al-Thani, in 2014, I informed Lt. Col. Al
5  Mannai and the person who was assigned to oversee defense work our companies[1]
6  that DSS must not accept any more projects of this nature and that I will not assist
7  in anyway.
8       16.    I was approached again by Raytheon for a second contract to produce
9  a second set of studies. I sent an email on August 30, 2014 urging the person
10 assigned to oversee defense projects for our companies not to accept it. I stated in
11 my August 30, 2014 email, Exhibit 6 hereto: "I received the following email and
12 & RFQ document from TRS. As per our previous conversation, we shouldn't get
13 involved with these studies. I wanted to share them with you before I inform them
14 that we will not be able to respond to their request for quote."
15      17.    Upon receiving another email from Raytheon on June 30, 2015, I
16 wrote back on July 3, 2015, stating: "As I mentioned to you and Mohamed Al
17 Mannai, we should decline this project," as reflected in Exhibit 7.
18      18.    I received another email from Raytheon on August 16, 2015. I
19 forwarded the email to Lt. Col. Al Mannai on August 16, 2015, and stated: "I
20 received the email below from Raytheon's procurement for the study. My
21 recommendation is we tell them we will pass on this project. I will reply to George
22 once I have received your agreement with my recommendation," as reflected in
23 Exhibit 8.
24      19.    Upon receiving a reply, I wrote back on August 17, 2015 stating "I
25 believe George knows you are the point of contact for this project and already sent
26 you a number of emails about it. **Sorry I can't help but we agreed I won't be**
27 **involved when we talked in Doha**," as reflected in Exhibit 9.
28

---

[1] Names of individuals not parties to this legal action are redacted to protect their privacy.

5

20. In spite of my repeated conversations and emails to decline the new studies project, I learned sometime in 2016 that the company accepted the studies contract from Raytheon. A number of months later, I learned from the accountant that the company started to receive the payments from Raytheon and the accountant was not aware of any projects the company has with Raytheon to book these payments against. The payments for this second sham agreement totaled QAR 3,467,500 (US $950,000).

21. In an attempt to launder this money without being detected, they created a third sham contract in 2016 with a small local Qatari construction company called Osoul. Under this third sham contract, Osoul issued sham invoices back dated to 2014, two years before the Osul sham contract was created in 2016, as reflected in Exhibit 10. However, Osoul did not create the studies, since they had been already created and finalized by Raytheon . Not only did Osoul lack the resources and expertise, but the independent digital forensic analysis establishes that the studies had already been created by Raytheon.

22. In a further effort to avoid detection, Lt. Col. Al Manni and Mr. Abu Issa signed and issued checks to Osoul from three different bank accounts from two different companies. This was in spite of the fact that the sham contract with Osoul was created with one of our companies, as payments for the sham invoices for the 2014 and 2016 studies, as reflected in Exhibit 11.

23. I urged DSS shareholders on numerous occasions verbally and in writing not to engage in illegal activities; however they failed to heed my recommendations. Accordingly, I decided in 2016 to relocate to the U.S. and left Qatar at the beginning of March, 2017. However, I continued to be in charge of resolving the dispute with QAF as was confirmed by Lt. Col. (Ret.) Khan " Mr. Fouad was in charge of DSS and led the negotiations with QAF even after he relocated to the United States. He travelled to Qatar several times to attend meetings related to the dispute". Deem Ex. A-1.

**Creation of the Sham Settlement Agreement**

24. Lt. Col. Al Mannai and Mr. Abu Issa never informed the ICC even once in July, August or September or in their many letters since request for arbitration was filed in June 2018 that they purportedly executed a settlement agreement with QAF.

25. It was only when the Minister of Defense was informed of the discovery of the bribes in September 2018, through conversation between Cooley and Cater Ruck and the filing of the action before the U.K. High Court of Justice on October 12, 2018, that Lt. Col. Al-Mannai was ordered to have DSS enter into a sham settlement agreement, whereby DSS would purportedly release $4.4 million of QAF's outstanding debt for no lawful consideration, and DSS would appear to accept $2.4 million, less than one third of what was owed, in exchange for Lt. Col. Al-Mannai and Mr. Abu-Issa not being prosecuted for facilitating the bribes and laundering the bribe money. This was in direct conflict with the best interests of DSS. This is further evident with the confirmation that QAF made payment on November 1, 2018 and released the company's performance bond and letter of guarantees on November 21, 2018. QNB Account Statement in Exhibit 12.

26. Hence, when Lt. Col. Al-Mannai and Mr. Abu-Issa purportedly staged a Board meeting on September 30, 2018 in which they attempted to remove me as the Manager in charge of DSS, they were also acting in direct conflict with the best interests of DSS, in order to obtain the personal benefits of not being prosecuted for facilitating the bribes of the brother of the Emir.

27. Moreover, neither Lt. Col. Al Mannai nor Mr. AbuIssa had the authority as Company manager in charge to sign the purported settlement agreement, whether in August 31, 2018, or as more likely November 2019, nor did they have authority to release the employees' human resources records to QAF.

**Lt. Col. Al-Mannai and Mr. Abu-Issa's Fraudulent Misrepresentations Regarding the Status of DSS**

28. Lt. Col. Al-Mannai and Mr. Abu-Issa's declarations, purportedly on behalf of DSS, evidence their fraudulent misrepresentations as to their unlawful attempt to remove me as the manager in charge of DSS. To begin with, Lt. Col. Al Mannai and Mr. AbuIssa were doing everything possible not to be prosecuted for facilitating the bribes. Moreover, so long as I owned more than 10% of the outstanding shares of DSS, I was entitled to be one of the 3 managers of the Company, per the terms of partners' shareholders agreement. ECF39-5:1150, ¶5.2.

29. According to Lt. Col. Al-Mannai's Exhibits 17 and 18, ECF 40-21 and 40-22, a purported general assembly took place on September 30, 2018 and meeting minutes were signed by Lt. Col Al Mannai and Mr. Abu-Issa stating that according to the "resolution" of the two tainted shareholders, I was still Manager in charge of DSS through September 30, 2018.

30. Lt. Col. Al-Mannai and Mr. Abu-Issa also fraudulently signed and filed the Ministry of Commerce official forms on July 23, 2018 to remove my name from DSS' Commercial Registration, well over 2 months before they staged the September 30, 2019 general assembly, at which they improperly attempted to remove me as a manager of the company, without an untainted majority vote. ECF 40-4:1298.

31. Lt. Col. Al Mannai and Mr. Abu-Issa also fraudulently used the new July 23, 2018 DSS Commercial Registration and Signed a power of attorney for Dentons at the Ministry of Justice on August 1, 2018, as reflected in Exhibit 13.

32. Lt. Col. Al Mannai and Mr. Abu-Issa had no authority as neither of them was Manager in charge to remove me as a Manager, or retain Dentons in June 2018 as Mr. Nummor stated in his declaration. Moreover, such actions were in direct conflict with the best interests of DSS, and done for their own personal benefit and in response to the threats from the minister of defense to abort the arbitration.

33. Lt. Col. Al Mannai and Mr. AbuIssa obstructed the ICC arbitration in 2018 and fraudulently informed the ICC on numerous occasions in August 2018 and September 2018 that I am not the manager in charge and providing copies of the false Commercial Registration fraudulently filed with the ministry of Commerce.

34. Lt. Col. Al-Mannai and Mr. Abu-Issa further obstructed the ICC arbitration in 2018 and fraudulently informed the ICC on numerous occasions in August 2018 and September 2018 that Cooley does not represent DSS, when, in fact it did, and provided a copy of the fraudulently created power of attorney which had been fraudulently filed with the ministry of justice.

**Lt. Col. Al Mannai and Mr. AbuIssa's Misrepresentations About the Purported September 26, 2019 Meeting and DSS Financial Condition**

35. Lt. Col. Al Mannai's February 3, 2020 declaration falsely states that he gave notice to me of an Extraordinary General Assembly ("EGA") Meeting. This is directly contradicted by Lt. Col. Al Mannai's September 18, 2019 email, ECF 36-13:1073 and 36-14:1075-77, in which he invited me as a board member to attend a DSS board of directors meeting.

36. Lt. Col. Al Mannai stated in his September 18, 2019 email "In my capacity as a Chairman of The Board for Digital Soula Systems, I hereby request your presence, in person, for a Board Meeting that will take place on Thursday, the 26th of September 2019, in Doha." ECF 36-13:1073. Neither an EGA nor a regular general assembly or any other meeting was mentioned in his email except a board of directors meeting. The email then lists the Proposed Agenda for the meeting:

1. DSS Financial Status
    a. 2018 Audited report.
    b. YTD 2019 Financials (End of August 2019).
2. DSS Board Decision needed for Future of DSS
    a. Operate or Liquidate
3. Any Other Item.

37. The email makes no reference to any EGA or general assembly meeting. The entire email is about the board meeting, board meeting agenda and Board decision for the future of DSS. ECF 36-13:1073.

38. There was no such general assembly meeting, let alone an "extraordinary" general assembly meeting. There was no required 30 day notice of such a meeting, and no balance sheet of the company provided for such a meeting, nor was there an agenda distributed as required by CCL Articles 120-132, 137-9.

39. Instead, I was invited to attend a DSS Board Meeting, as a member of the Board, which meeting was scheduled for September 26, 2019 in Doha, Qatar with 7 days notice, as reflected in Lt. Col. Al-Mannai's email of September 18, 2019, ECF 36-13:1073. I was requested to appear in person, knowing I would be risking my safety if I were to return to Qatar, in order to make sure I will not be able to participate. I had participated in several prior board meeting via conference call from the United States and never had to fly to attend a board meeting in person.

40. As had been the custom and practice of the DSS Board, when members were not available to attend in person or via teleconference; voting was permitted by email. On September 26, 2019 I voted no at the Board meeting on the proposed liquidation of the company, as reflected in my email, ECF 36-14:1075, and my registered mail of the same date, ECF 36-14:1076-77.

41. Moreover, since Lt. Col. Al-Mannai and Mr. Abu-Issa's votes at the September 26, 2019 Board meeting remained tainted by their having voted in direct conflict with the best interests of DSS, and in favor of the interests of, and upon the order of, the QAF, 100% of the remaining eligible shares voted not to liquidate DSS, as per CLL 333, which provides: "if approved by the shareholders or partners holding 50% of the capital after excluding the shares held by the members of the board of directors subject to the considered dismissal."

42. As DSS counsel concedes, CCL Article 291-5 requires that the partners unanimously agree to dissolve the company before the end of its term,

unless the Company's contract states its dissolution by a certain majority. Contrary to Mr. Nammour's erroneous opinion, given the tainted nature of Lt. Col.

Al-Mannai and Mr. Abu-Issa's votes, the required majority for dissolution has not been met.

43. Moreover, neither Article 26 nor 37 of DSS' Articles of Association are triggered here. Contrary to Lt. Col. Al-Mannai's and Mr. Nammour's erroneous declarations, losses of the company have not reached half of the capital, since according to the minutes of Lt. Col. Al-Mannai and Mr. Abu-Issa's staged September 26, 2019 meeting, had the company enforced the QAF debt of $4.4 million, it would have had no losses, but a substantial profit of more than $4.2 million, after paying all other outstanding debts. ECF 40-22.

44. The staged September 30, 2019 minutes also fraudulently allege that DSS' losses were caused by me seeking to enforce invoices for work that was not performed by DSS. However, the only independent non-party witnesses, Lt. Col. (Ret.) Pelz and Col. (Ret.) Hall, who have nothing to gain from the outcome of this dispute, have declared that DSS performed all work required by the Consultancy Services contract, which lasted well over a year, and that QAF still owes DSS for the work performed.

45. Moreover, contrary to Lt. Col. Al-Mannai's false declaration, he signed the majority of the invoices issued to QAF, from November 2015 through June 2017, totalling QAR 19,957,610 (U.S. $5,682,803),as reflected in Exhibit 14 hereto. In addition, he stated in his August 10, 2017 letter to QAF Procurement Manager that: "A. the contract ...is still in effect and in force up to date. B. Accordingly, the performance bond given by Digital Soula Systems in the interest of Qatar Armed Forces, as per the terms and conditions stated in the contract, is still valid as said contract has not been terminated or revoked by Qatar Armed Forces. C. No more invoices will be sent to the General Head Quarters of Qatar Armed Forces regarding advisory services in the future. The monthly invoices

will be compiled and submitted periodically to HE Minister of State for Defense Affairs," as reflected in Exhibit 15 hereto. Al-Mannai's declaration is also contradicted by the letter from the QAF project deputy director submitted to the court in which he confirmed The Falcon Project Deputy the project delays were caused by QAF and the project will likely be extended by 6 months, as reflected in Exhibit 16 hereto.

46. Lt. Col. (Ret.) Lothar Pelz stated in his February 7, 2020 declaration "All invoices have been signed by Mr. Al Mannai personally, I had to go to his office a few times to pick them up, including covering letters signed by him. This shows that he submitted the invoices, contrary to his statement that Mr. Tarek should not have sent them. Mr. Al Mannai was aware of the lack of payments and quite upset about it when we met." He also stated "I personally was sent to deliver invoices signed by Mr. Mohamed Al Mannai to the Procurement Directorate. On 12.12.2016 I met with Col Hussain Saleh of the Procurement Department'. "On 18 April 2017, Mohamed Al Mannai appointed me as interim CEO of DSS, while Mr. Fouad was out of the country. During this time, Mr. Al Mannai still pursued getting the payments due from the QAF."

47. Col. (Ret.) James Hall stated "Copies of these invoices are held by Mr Fouad. In each case they clearly show the signature of Mohamed Abdulla Ali Matar Al-Mannai. Hence, Mr. Al-Mannai has no valid reason for now trying to suggest that Mr. Fouad had no right to continue presenting such invoices. Mr Al-Mannai had in fact signed and sent them himself!" (See ECF 40-22:1382.

**The Minister of Defense Obstruction of the First and Second Arbitrations**

48. I was in charge of DSS and resolving the dispute with QAF as confirmed by Lt. Col. (Ret.) Hussain Khan "Mr. Fouad was in charge of DSS and led the negotiations with QAF even after he relocated to the United States. He travelled to Qatar several times to attend meetings related to the dispute". Deem Ex. A-1.

49. I always acted in the best interest of DSS shareholders regardless of

their unlawful conduct.  Lt. Col. (Ret.) Hussain Khan Hussain's witnessed our agreement and stated "Mr. Fouad and Mr. Al Mannai agreed that Mr. Fouad would play the 'bad cop', pushing for arbitration because QAF has been refusing to pay the outstanding balance since 2016 and Mr. Al Mannai would play the 'good cop' pushing for amicable resolution.  They agreed to do that in order to protect the Qatari owners from any reprisal by Qatar Armed Forces or Qatar Government.". Deem Ex. A-1. Lt. Col. (Ret.) Hussain Khan also confirmed the minister's threats to Lt. Col Al Mannai " I was subsequently informed by Mr. Al Mannai in March 2018 that the DSS has to stop all legal actions immediately because the minister of defense told Lt. Col. Abdulla Al Kuwari that the Minister would refer Mr. Al Mannai to the Emir, informing him that Mr. Mannai, who is an officer with Qatar Armed Forces, is taking legal action against Qatar in England in the middle of the regional political crisis." Deem Ex. A-1.

50. The Ministry of Defense director of legal affairs did not deny the threats when I confronted him in an April 2018 meeting in Qatar.   Lt. Col. (Re.) Khan stated "Mr. Fouad scheduled a further meeting with Lt. Col. Abdulla Al Kuwari in April 2018 and asked me to attend the meeting. During this meeting, Mr. Fouad brought up the minister's intention made to Mr. Al Mannai with Lt. Col. Abdulla Al Kuwari. Lt. Col. Abdulla Al Kuwari said the minister wants to see the officer who is taking legal action against Qatar Armed Forces in England". Deem Ex. A-1.

**First ICC Arbitration Attempt**

51. The plan was to file for only 20% of the QAF outstanding balance in the first arbitration in June 2018, and then amend it to arbitrate the full amount owed to DSS once the minister of defense denied he made any threats to Lt. Col. Al Mannai and Mr. AbuIssa.  However, the minister of defense did not deny making any threats, instead he ordered Lt. Col. Al Manni and Mr. Abu Issa to obstruct and ultimately dismiss the arbitration.  Carter Ruck and Dentons worked hand in glove to obstruct and abort the arbitration.

**Second ICC Arbitration Attempt**

52. As the surviving director with no conflict of interest and the only director with clean hands, I instructed DSS attorney (Cooley) to file for arbitration at the ICC in February 2019 requesting the full amount owed by QAF. I wrote a personal letter to the minister of defense at the beginning of February and asked him to allow the arbitration to move forward. However, QAF continued to obstruct the arbitration. I informed the minister in my April 10, 2019 letter "In response to this continued obstruction of the arbitration process by Qatar Armed Forces, I have instructed Digital Soula Systems' attorney to withdraw the February 20, 2019 Request for Arbitration if no progress is made by April 19, 2019 by Qatar Armed Forces to allow a speedy arbitration to move forward. Thereafter, I shall feel compelled to proceed with litigation against Qatar Armed Forces before a United States Federal Court" as reflected in Deem Ex. C. The minister of defense continued to obstruct the arbitration process and QAF did not file a response to DSS' request for arbitration or pay its share of ICC arbitration fees. Cooley withdrew the request for arbitration on my instruction to seek relief in this Court.

**Dentons' Conflict of Interest**

53. I was introduced to Dentons in Qatar, as reflected in Exhibit 17 hereto, by Al Sedria and Qatar Horizon (AFUQ Qatar) CFO. Dentons, including Mr. Nummor represented both of these companies owned by sheik Joaan bin Hamad Al Thani. I declined to retain Dentons to help with any legal matter related to any of our companies because Dentons had a clear conflict of interest. This was evident as Dentons acted against the interest of DSS every step of the way during the dispute with QAF and worked with QAF attorneys hand in glove to abort the ICC arbitration in the U.K. and in this Court. Dentons is simply more interested in protecting the interests of sheik Joann bin Hamad Al Thani and his business partner Lt. Col. Al Mannai than the interest of DSS.

**Investigating Bribes**

54.   Qatar failed to investigate the bribes and money laundering activities supported by undisputed evidence, despite my April 10, 2019 invitation, as reflected in Exhibit 18. The Emir of Qatar and his government refused to investigate corruption by the Emir's own brother and his business partner and associates.

**Conclusion**

55.   My declaration along with independent witness declarations from retired senior military officers who worked at DSS as defense consultants well over two and a half years ago and have nothing to gain in this dispute have only told the truth as we witnessed it.  Their declarations confirm the facts stated to this court and that I acted honorably and with the utmost Integrity.  This record shows I did not facilitate bribes or money laundering and urged the other shareholders on numerous occasions verbally and via emails to stop it, and when they didn't, I decided to return to the US. I always acted in the best interests of all of DSS shareholders regardless of their unlawful conduct.

56.   Since I have first hand knowledge of the bribes paid by Raytheon to sheik Joann bin Hamad Al Thani, I cannot obtain a fair, impartial, and safe adjudication of this dispute in Qatar, which is acknowledged by the QAF having agreed to arbitration of this dispute in any state who is a party to the New York convention.

57.   The U.N. Special Rapporteur on the Independence of Judges publicly reports that Qatar's government interferes in the work of the Qatar judiciary, particularly in cases involving high-level persons or businesses, and its violations of due process and fair trial guarantees in the country, are of grave concern, along with the consequences that such violations often have on individuals' lives are also troubling, as reflected in ECF 36-2.  Accordingly, I invoke this Court's jurisdiction under the FAA, FSIA and the U.S. public policy in favor of international arbitration of such commercial disputes in neutral venues, is invoked

to compel the QAF to comply with its agreements to pay Digital Soula Systems ("DSS") for its consultancy services and to arbitrate this dispute in this District. I cannot receive due process in a Qatari court which is controlled by the Emir of Qatar, where bribes paid for the benefit of his brother are relevant to the suit. It would be a one way ticket to Qatar for me. As Paul Stevenage, one of DSS' consultants, learned first hand, having been prohibited from leaving Qatar, since becoming a party to litigation of a debt in Qatar almost three years ago.

    I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and was executed on February 10, 2020, in San Diego, California.

/s/Tarek Fouad
Tarek Fouad